2011 Ark. App. 738

**Derek Lee JACKSON, Appellant**

v.

**STATE of Arkansas, Appellant.**

**No. CA CR 11–14.**

Court of Appeals of Arkansas.

Nov. 30, 2011.

Chad M. Green, Little Rock, for appellant.

Dustin McDaniel, Atty. Gen., Eileen W. Harrison, Little Rock, for appellee.

WAYMOND M. BROWN, Judge.

A Pulaski County jury found appellant Derek Lee Jackson guilty of the second-degree murder of Anthony Fogle. He was sentenced to thirty years' imprisonment with an additional fifteen-year enhancement for using a firearm in the commission of the murder. Jackson contends that the trial court erred by denying his motion to suppress when (1) his statement was the product of coercion and (2) the police violated his rights by improperly re-initiating contact with him after he had invoked his rights. He also argues that the trial court erred by denying his motion to dismiss on

due-process grounds due to the city's failure to preserve evidence. We affirm.[1]

On March 4, 2009, Jackson was charged by felony information with the first-degree murder of Anthony Fogle.[2] Jackson filed a motion to suppress his custodial statement and to dismiss the charge against him on September 16, 2009. A brief in support of Jackson's motion was also filed at that time. A hearing on Jackson's motion took place on October 22, 2009.

Detective Tommy Hudson of the Little Rock Police Department testified that he investigated the December 13, 2008 death of Fogle. According to Det. Hudson, Fogle died as the result of a single gunshot wound to his chest. Detective Hudson stated that Jackson was developed as the suspect in Fogle's death. He said that he went to Jackson's address in January 2009 because there was an active warrant for Jackson's arrest in an unrelated case. Jackson was taken into custody at 3:40 p.m., and Det. Hudson met with him at 4:35 p.m. Detective Hudson testified that he read Jackson his *Miranda* rights twice on January 12, 2009.[3] Detective Hudson stated that Det. Greg Siegler was present during Jackson's first interview, and that Det. J.C. White was present during the second interview. He stated that after he informed Jackson that he was being charged with Fogle's murder, Jackson was placed in an interview room at the end of the hall. Jackson's second interview took place at 6:35 p.m. Detective Hudson said that he made contact with Jackson after the first interview in order to obtain Jackson's personal information to fill out the arrest report. At that time, Jackson asked Det. Hudson if he was really being charged. When Det. Hudson answered in the affirmative, Jackson stated that he needed to tell Det. Hudson what happened. After Jackson was read his rights the second time, he confessed to shooting Fogle. Detective Hudson contended that he did not initiate the conversation that led to Jackson's confession. He also stated that he did not threaten Jackson and that he did not promise Jackson anything in exchange for the statement.[4]

Detective Hudson also testified that the investigation into Fogle's murder was covered by the television show *Crime 360*.[5] He stated that the production team for the show followed him, as well as other detectives, as suspects were developed in the Fogle case. He said that the show installed cameras in the conference room and provided DVD burners for the department.[6] Detective Hudson testified that he did not direct the cameraman "as to whom to video." He stated that the camera crew "pretty much had free reign to film whatever they wanted." According to Det. Hudson, he saw the show when it aired

---

1. This is the second time this case is before us. We originally remanded the case for supplementation of the addendum. *See Jackson v. State*, 2011 Ark. App. 620, 2011 WL 4824316.

2. Jackson was eventually convicted of second-degree murder.

3. This was necessary because Jackson was interviewed on two separate occasions on January 12, 2009.

4. Both of Jackson's interviews were recorded. However, there was no recording of Det. Hudson obtaining Jackson's personal information.

5. *Crime 360* is a television show produced by Base Productions, Inc.

6. The show's cameraman rode along with homicide detectives whenever they investigated a murder between late 2008 and part of 2009.

and it "throughly covered all parts of [his] investigation."

On cross-examination, Det. Hudson stated that the camera crew recorded him talking to witnesses, other detectives working on the Fogle case, and the crime scene. According to Det. Hudson, tips were received indicating "Little YG" and Gerald as possible suspects in Fogle's death. He stated that he was able to discount both of those persons as suspects. Detective Hudson testified that the interview room Jackson was placed in after the first interview had cameras in it. However, he stated that they were for administrative purposes, and that detectives could not get a copy of that video. He also said that even if a recording had been taken, it was unlikely that it would still exist due to the passage of time. Detective Hudson denied telling Jackson that DHS would take his stepson. He also denied hearing any other officer tell Jackson that DHS would get involved. Detective Hudson acknowledged that he told Jackson that he was going to pick up Jackson's wife, Tamara, after Jackson's first interview. According to Det. Hudson, Tamara was going to get picked up "to see if what she said would match up with what he was saying." Detective Hudson also said that the reason he did not stop questioning Jackson after Jackson stated that he was "through talking" was because he was trying to "clarify that [Jackson] was through talking with [him]."

Detective Hudson further testified that he did not receive "tapes of all of the stuff the production crew filmed because the agreement with the city was that we couldn't see it until it aired." He conceded that the material could have been helpful in their investigation of Fogle's murder. Detective Hudson stated that Tamara made a statement that Jackson confessed his involvement in Fogle's murder to her.

According to Det. Hudson, Tamara's statement did not make him go back and talk to Jackson. He denied telling Jackson that his wife could be charged, and he denied mentioning DHS and Jackson's child while in the interview room.

Detective J.C. White testified that he interviewed Tamara on January 12, 2009. He stated that he informed Det. Hudson that Tamara told him about Jackson's involvement in the crime. According to Det. White, Det. Hudson "went back and came down a short time later and told me that Mr. Jackson wanted to talk some more about what happened." Detective White said that he was present during Jackson's second interview.

On cross-examination, Det. White stated that he did not recall mentioning DHS and the child to Jackson, but that if it was discussed, "it would have been to tell him that we needed to find someone to take care of the child who was with Jackson when he was arrested and not as a threat." He contended that they "would not threaten a person by telling them their children will be taken away from them by DHS."

Detective Siegler testified that he was present during Det. Hudson's first interview with Jackson. According to Det. Siegler, there were no threats made to Jackson. On cross-examination, Det. Siegler stated that there was a discussion between them and Jackson before the audio recorder was turned on. He said that Det. Hudson "got ... Jackson's story then turned on the tape recorder."

Jackson testified that he was married to Tamara at the time of his arrest. He said that when he asked Det. White about his stepson following his arrest, Det. White told him that the child was going to DHS. He also stated that Det. Hudson told him that his wife could be charged with murder. Jackson said that he was invoking his rights when he told Det. Hudson that

he was through but that Det. Hudson did not stop asking him questions. Jackson acknowledged that Det. Hudson came back to the room at some point to fill out paperwork. According to Jackson, he asked Det. Hudson what he was doing, and Det. Hudson replied that he was being charged with first-degree murder. Jackson stated that when he asked about his son, Det. Hudson said the child was going to DHS. He also said that Det. Hudson told him that his wife was being charged with murder. Jackson further testified, "I told Detective Hudson I would tell him whatever he wanted after [he] mentioned [my] son and wife so he would let them go. I wanted to protect them. During my second statement I stated that I hadn't been threatened because I didn't want to jeopardize my family." According to Jackson, he gave the second statement implicating himself in the murder because he "wanted to protect [his] family."

On cross-examination, Jackson stated that Det. White told him that his son would go to DHS and that his wife could be charged with murder as he was walking Jackson into the police station. Jackson said that he took it as a threat and was scared. Jackson testified that he understood his rights and decided to talk to the police. According to Jackson, Det. Hudson talked to him for about one minute after he invoked his rights during the first interview. Jackson stated that he felt the need to protect his family during the first interview and that is why he told the detectives that he did not have anything to do with Fogle's murder. Jackson acknowledged that he told Det. Hudson that he had not been threatened.

At the conclusion of the hearing, Jackson's counsel argued that Jackson's statement should be suppressed because it was the product of coercion. Counsel also argued that Det. Hudson improperly re-initi-ated the interrogation after Jackson invoked his rights because Det. Hudson's contact with Jackson for the purpose of filling out paperwork was pretextual. Finally, counsel argued that the charge against Jackson should be dismissed because "the police failed to preserve evidence, the tapes and raw footage shot by the production company." According to counsel, the erased footage "would have been potentially useful" and it "could have potential impeachment material."

The court denied Jackson's motion to dismiss stating that it did not think that "you can hold the police responsible for tapes that these people have taken off to Hollywood." The court denied Jackson's motion to suppress on the ground of coercion, stating that there was nothing in Jackson's "demeanor or anything on the tapes or the action of the police that show that there was coercion that broke [Jackson] down." The court also found that there was no pretext in Det. Hudson making contact with Jackson to fill out the arrest report.

Jackson's jury trial took place on September 13 and 14, 2010. Jackson's counsel renewed the motions to suppress and to dismiss. The court denied the motions. Christina Hart testified that she was present at the Coastal station on December 13, 2008, when Fogle was shot. According to Hart, she was near the vacuum cleaners when she looked up and saw "a man with a pistol pointed at a[sic] another man and the man shot him." She stated that the shooter drove off in a "tan, light yellow" Chevy Nova. Gerald Trice testified that he witnessed Jackson shoot Fogle on December 13, 2008. He also stated that the victim did not have a gun. According to Trice, Jackson was driving a "tan yellowish Nova." Trice admitted that he initially told the police that he did not see anything because he feared for his life. According

to Trice, Jackson told him not to say anything. Trice said that he decided to tell the truth after he saw pictures of Fogle lying on the ground.

Tamara testified that Jackson was at the Coastal station in his tan Chevy Nova on December 13, 2008. She stated that Jackson and the victim got into an argument; however, she said that when the argument was over, she and Jackson got in their cars and left.[7] Tamara said that she eventually went home and that Jackson arrived home five to eight minutes later. She acknowledged that she informed detectives that Jackson told her "he shot the man at the car wash." However, on cross-examination, Tamara stated that she only implicated Jackson in the murder because the detectives threatened her with jail and told her that DHS could take her son.

Detective White testified that Tamara was not under arrest when she was interviewed on January 12, 2009, and was free to leave. On cross-examination, he stated that he did tell Tamara that she could be charged with lying to the police. He also acknowledged that he told Tamara that she was putting her children at risk. Detective Hudson testified that in the first interview, Jackson denied shooting Fogle. Detective Hudson said that Jackson told him that Jackson and Fogle got into an altercation, but that Jackson left after the altercation. Detective Hudson stated that when he went down to get Jackson's current address, Jackson asked if he was really being charged with murder. After Det. Hudson told Jackson he was, Jackson stated that he wanted to tell Det. Hudson what happened. In the second interview, Jackson admitted that he shot Fogle; however, he claimed that Fogle also had a gun. On cross-examination, Det. Hudson acknowledged that Tamara was interviewed at the police station by Det. White. He also acknowledged that Trice and Travis Wesson were suspects in the Fogle murder.

Jackson testified that he got into a verbal altercation with Fogle, and left after he and his wife finished cleaning their cars. He stated that he confessed to shooting Fogle because the detectives threatened to take his kids and pick up his wife. According to Jackson, he was just trying to protect his wife and kids.

Jackson was found guilty of the second-degree murder of Fogle and sentenced to forty-five years' imprisonment. The judgment and commitment order was entered on September 22, 2010. Jackson filed a timely notice of appeal on October 8, 2010.

Jackson makes two arguments with regard to the suppression of the statement he made during custodial interrogation. First, he argues that the court should have excluded his statement because it was the product of coercion. Second, Jackson argues that any statement he made after he invoked his right to remain silent should have been suppressed because the police violated his rights by improperly re-initiating contact with him.

▮ A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily.[8] The appropriate standard of review for cases involving a trial court's ruling on the voluntariness of a confession is that we make an independent determination based upon the totality of the circumstances.[9]

---

7. Tamara and Jackson were in separate cars at the Coastal station.

8. *Bryant v. State,* 2010 Ark. 7, 377 S.W.3d 152.

9. *Id.*

We review the trial court's findings of fact for clear error, and the ultimate question of whether the confession was voluntary is subject to an independent, or de novo, determination by this court.[10] Issues regarding the credibility of witnesses testifying at a suppression hearing are within the province of the circuit court.[11] Any conflicts in the testimony are for the circuit court to resolve, as it is in a superior position to determine the credibility of the witnesses.[12] The circuit court is not required to believe the testimony of any witness, especially that of the accused, since he or she is the person most interested in the outcome of the proceedings.[13]

In order to determine whether a waiver of *Miranda* rights is voluntary, knowing, and intelligent, *this court looks to see if the statement was the product of free and deliberate choice rather than intimidation, coercion, or deception.*[14] To make this determination, we review the totality of the circumstances surrounding the waiver including the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; the use of mental or physical punishment; and statements made by the interrogating officers and the vulnerability of the defendant.[15] The proper inquiry is whether appellant's will was overborne or his capacity for self-determination critically impaired.[16]

Here, after listening to all the evidence, the court found that Jackson's statement was not the product of coercion. The court was faced with conflicting testimony, and those conflicts were for the circuit court to resolve. There was no evidence to support Jackson's allegation that the detectives made statements that overrode his will and coerced him into implicating himself in the murder of Fogle. In fact, Jackson stated on the recording that he had not been threatened. Additionally, Jackson stayed calm and collected throughout the interview. We cannot say that the circuit court clearly erred in refusing to suppress Jackson's statement on this basis.

Jackson also argues that the court erred by denying his motion to suppress when the detectives re-initiated contact with him after he invoked his right to remain silent. A person subject to custodial interrogation must first be informed of his right to remain silent and right to counsel under *Miranda v. Arizona.*[17] Statements improperly taken after the invocation of the right to remain silent or the right to counsel must be excluded from the State's case in chief to ensure compliance with the dictates of *Miranda.*[18] An indication that a defendant wishes to remain silent is an invocation of his *Miranda* rights.[19] Once the right to remain silent is invoked, it must be scrupulously hon-

10. *Id.*

11. *Porter v. State*, 2010 Ark. App. 657, 379 S.W.3d 528.

12. *Id.*

13. *Vance v. State*, 2011 Ark. 243, 383 S.W.3d 325.

14. *Bryant, supra.*

15. *Id.*

16. *Standridge v. State*, 357 Ark. 105, 161 S.W.3d 815 (2004).

17. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

18. *See Michigan v. Harvey*, 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990).

19. *Robinson v. State*, 373 Ark. 305, 283 S.W.3d 558 (2008).

ored.[20] The meaning of "scrupulously honored" was discussed in *James v. Arizona:* [21]

> To ensure that officials scrupulously honor this right, we have established in *Edwards v. Arizona,* [451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)], and *Oregon v. Bradshaw,* [462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983)], the stringent rule that an accused who has invoked his Fifth Amendment right to assistance of counsel cannot be subject to official custodial interrogation unless and until the accused (1) "initiates" further discussions relating to the investigation, and (2) makes a knowing and intelligent waiver of the right to counsel under the [waiver] standard of *Johnson v. Zerbst,* 304 U.S. 458 [58 S.Ct. 1019, 82 L.Ed. 1461] (1938), and its progeny.

(Some citations omitted.) When invoking a *Miranda* right, the accused must be unambiguous and unequivocal.[22] Our supreme court has extended the *Davis* holding by reviewing the question of specificity when invoking the right to silence.[23]

Jackson argues that the circuit court should have suppressed his statement because, after he invoked his right to remain silent, Det. Hudson re-initiated contact with him. This argument is without merit. Detective Hudson stated that when he went to get some personal information from Jackson, Jackson inquired about the charge against him. According to Det. Hudson, once Jackson learned that he was really being charged with Fogle's murder, he informed Det. Hudson that he wanted to tell what happened. At that point,

Jackson was taken to the conference room and again read his *Miranda* rights. Upon waiving his rights, he acknowledged his involvement in the Fogle case. Jackson also testified that Det. Hudson ⌐13came to the room to fill out paperwork. The evidence shows that it was Jackson, not Det. Hudson, who initiated the conversation about Jackson's charge. Since Jackson initiated the contact, Det. Hudson was not required to honor Jackson's earlier decision to remain silent. However, Jackson was again read his rights, which he waived. Accordingly, the circuit court correctly denied Jackson's motion to suppress his statement on this ground.

 Finally, Jackson argues that his due-process rights were violated by the city's failure to preserve evidence. Jackson contends that City Attorney Tom Carpenter's email supports his position that the City of Little Rock took no action in preserving the raw footage of Base Productions, Inc. According to Jackson, the city took "affirmative measures to ensure that [potentially useful materials would not get in the hands of defendants]." The State is only required to preserve evidence that is expected to play a significant role in appellant's defense, and then only if the evidence possesses both an exculpatory value that was apparent before it was destroyed and a nature such that the defendant would be unable to obtain comparable evidence by other reasonably available means.[24] In order to show that the failure to preserve evidence constitutes a due-process violation, the defendant must show bad faith on the part of the State.[25]

---

20. *Id.*

21. 469 U.S. 990, 992–93, 105 S.Ct. 398, 83 L.Ed.2d 332 (1984).

22. *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

23. *See Standridge, supra.*

24. *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *Wenzel v. State,* 306 Ark. 527, 815 S.W.2d 938 (1991).

25. *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *Autrey v. State,* 90 Ark.App. 131, 204 S.W.3d 84 (2005).

Here, Jackson has failed to show any exculpatory value that was apparent in the raw footage before it was destroyed by Base Productions. He has failed to show how the city ₗ₁₄attorney's refusal to classify all active crimes and homicide scenes as belonging to the city such that the production company did not need separate permission to enter the property resulted in the deletion of raw footage. Jackson is also unable to show bad faith on the part of the State. Therefore, there was no due-process violation, and the court properly denied his motion to dismiss.

Affirmed.

WYNNE and ABRAMSON, JJ., agree.