78 A.3d 449

**Demetrius D. LOVELACE**

v.

**STATE of Maryland**

**No. 2842, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Oct. 30, 2013.

---

514

Shea L. Hoxie (Bruce A. Johnson, Jr., LLC, on the brief), Bowie, MD, for appellant.

Ryan Dietrich (Douglas Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellant.

Panel: WOODWARD, ZARNOCH, RAYMOND G. THIEME, JR. (Retired, Specially Assigned), JJ.

WOODWARD, J.

Demetrius D. Lovelace, appellant, was arrested on April 1, 2008, in connection with the death of Alan Zurita. On November 12, 2008, appellant was indicted on fourteen counts, including first degree murder. Beginning on November 2, 2009, a jury trial was held in the Circuit Court for Harford County. At the close of the State's case-in-chief on November 9, 2009, the court granted defense counsel's Motion for Judgment of Acquittal as to first degree premeditated murder, which limited that charge to first degree felony murder. On November 12, 2009, the jury found appellant guilty of the following charges: (1) first degree felony murder; (2) robbery with a dangerous weapon; (3) robbery; (4) attempted robbery; (5) conspiracy to commit robbery; (6) possession of a firearm by a person convicted of a felony; (7) possession of a firearm by a person convicted of a crime of violence; and (8) possession of a firearm by a person convicted of a disqualifying crime.

On January 25, 2010, the trial court merged for sentencing purposes the convictions for robbery and attempted robbery into robbery with a dangerous weapon, and merged the convictions for possession of a firearm by a person convicted of a crime of violence and possession of a firearm by a person convicted of a disqualifying crime into possession of a firearm by a person convicted of a felony. The trial court sentenced appellant to life imprisonment without parole for the first degree felony murder conviction, twenty years for robbery with a dangerous weapon, fifteen years for conspiracy to commit robbery, and five years for possession of a firearm by a person convicted of a felony. The sentences for robbery with a dangerous weapon, conspiracy to commit robbery, and possession of a firearm were to be served consecutively to each other, but concurrently with the sentence for first degree felony murder. Appellant was also ordered to pay restitution in the amount of $10,408.00 for Zurita's hospital and funeral bills.

On appeal, appellant presents four questions for our review, which we have rephrased:

1. Did the trial court err in denying appellant's motion to suppress?

2. Did the trial court err in failing to merge the conviction for robbery with a dangerous weapon into the first degree felony murder conviction for the purpose of sentencing?

3. Did the trial court err in failing to follow up on a question answered in the affirmative during *voir dire* of the venire?

4. Did the trial court err by admitting a photograph of the victim with a family member?

For the reasons set forth herein, we answer questions 1, 3, and 4 in the negative, and answer question 2 in the affirmative. Accordingly, we shall vacate the sentence for robbery with a dangerous weapon and otherwise affirm all of the remaining judgments of the circuit court.

**518**

## BACKGROUND [1]

On April 1, 2008 at approximately 1:45 a.m., a red Mitsubishi Galant, driven by appellant, with Damon Jackson and Zurita as passengers, entered southbound on I–95 near Havre de Grace, Maryland. There was a plan between appellant and Jackson to rob Zurita. While appellant was driving, Jackson and Zurita got into a fight, and Jackson was shot. Appellant then stopped the car on the shoulder of southbound I–95; Zurita exited the vehicle followed by Jackson. Jackson shot and killed Zurita. Appellant then drove Jackson to the hospital, dropped him off in front of the emergency room, and left. The police found Zurita's body on the shoulder of southbound I–95 at 2:30 a.m. the same day.

At approximately 12:00 p.m. on April 1, 2008, appellant was arrested and taken to the Maryland State Police Forestville Barracks. At the barracks, appellant made statements to three officers, Sergeant Christina Becker, Corporal Richard Bachtell, and Corporal Michael Mann, over the course of two separate interviews. At the conclusion of the second interview, appellant gave a recorded statement and described the fight between Jackson and Zurita as a "robbery gone bad." Additional facts will be set forth herein to resolve the questions presented.

## DISCUSSION

### I.

### Statements

*First Interview*

At approximately 1:15 p.m., Sgt. Becker and Cpl. Bachtell advised appellant of his *Miranda* rights, and appellant subse-

---

1. Because appellant does not challenge the sufficiency of the evidence to sustain his convictions, we will provide only a brief background of the facts of the case to provide context for our discussion of the issues presented. *See, e.g., Bey v. State,* 140 Md.App. 607, 611, 781 A.2d 952 (2001), *cert. denied,* 368 Md. 526, 796 A.2d 695 (2002).

quently invoked his right to remain silent. According to Sgt. Becker, appellant "continued to speak" after invoking his right to remain silent, which prompted Sgt. Becker and Cpl. Bachtell to "cut [appellant] off" and explain that they could not speak with him unless he waived his *Miranda* rights. Approximately ten minutes after appellant's initial advice of *Miranda* rights, at 1:25 p.m., Sgt. Becker re-advised appellant of his *Miranda* rights, and appellant signed a form waiving his rights.

Thereafter, appellant told Sgt. Becker and Cpl. Bachtell that he had gone to Aberdeen to see a friend and while he was there, he saw Jackson. Later, according to appellant, when he was driving home, appellant received a call from Jackson to come back and pick Jackson up at his home. Appellant said that he made a U-turn, went back to where Jackson was residing and saw him "standing on the side of the building bleeding and gagging and sweating." Appellant stated further that Jackson got into his car, and appellant drove him to the hospital, where appellant dropped him off in front of the emergency room and left.

At some point during the interview, Sgt. Becker played for appellant a ten-second portion of a recorded interview in which Jackson claimed that appellant shot Zurita and Jackson. The interview with appellant concluded shortly thereafter at approximately 2:55 p.m.

### Second Interview

At approximately 5:30 p.m., appellant was removed from his holding cell and interviewed by Sgt. Becker and Cpl. Mann in the same room as the first interview. Sgt. Becker did not re-advise appellant of his *Miranda* rights, but "remind[ed] [appellant] that, in fact, his *Miranda* [r]ights that [she] read to [appellant] earlier, in fact, were still in effect." In addition, at appellant's request, the officers replayed approximately one minute of Jackson's recorded interview. Appellant then provided a statement in which he stated that "there was a plan and talk between [Jackson] and [appellant] that they were going to rob [Zurita]," and that it was "a robbery gone bad."

Appellant also stated that, as he was driving, Zurita and Jackson began fighting and Jackson was shot "apparently accidentally." Thereafter, according to appellant, Zurita exited the vehicle, followed by Jackson, who shot and killed Zurita.

In addition to detailing the planned robbery and the fight between Jackson and Zurita, Cpl. Mann testified that appellant described the gun that was used to kill Zurita and offered to show him where he had thrown the gun into a river in Harford County

### Recorded Statement

At approximately 7:00 p.m., following his statements to Cpl. Mann and Sgt. Becker during the second interview, appellant provided a twenty-one minute recorded statement in which he described the fight between Jackson and Zurita as a "robbery gone bad."

### Motions Hearing

On February 2, 2009, appellant filed a motion to suppress "any and all statements allegedly made by [appellant] to police" on April 1, 2008 at the Maryland State Police Forestville Barracks, on the ground that the statements were not voluntarily provided by appellant. In particular, appellant sought to suppress the statements made during the first and second interviews, as well as the recorded statement.

The circuit court held a hearing on appellant's motion to suppress on March 11, 2009. Sgt. Becker testified at length during the suppression hearing regarding the first interview with appellant, and her testimony is excerpted below:

[PROSECUTOR]: Prior to interviewing the [appellant], what, if anything, did you do?

[WITNESS]: Just had a very brief conversation, basically to determine who was going to go in to do the interview. And it was decided that myself and [Cpl.] Batchell would go[.]

\* \* \*

[PROSECUTOR]: So it was decided that you and [Cpl.] Batchell would go in and interview [appellant]. When you first went in and met with [appellant], what was the first thing that you did?

[WITNESS]: The first thing I did was introduce myself and [Cpl.] Batchell to [appellant] explaining to him that we were from the Maryland State Police Homicide Unit.

[PROSECUTOR]: What was the next thing you did?

[WITNESS]: **The next thing was we began to read [appellant's] Advice of Miranda Rights, utilizing the MSP Form # 180.**

\* \* \*

[PROSECUTOR]: Sergeant, I show you what's marked for identification as State's 1, and ask if you can identify that for the record.

[WITNESS]: Yes. This is the initial Advice of Miranda Rights that I read to [appellant].

[PROSECUTOR]: And the information that is filled out on that form, who completed the form?

[WITNESS]: The information at the top was completed by myself, and [appellant] signed it, and it was witnessed by Corporal Bachtell.

[PROSECUTOR]: And that is a copy of the actual form that was used that day?

[WITNESS]: That's correct.

[PROSECUTOR]: And it contains the signature of [appellant]?

[WITNESS]: That's correct.

\* \* \*

[PROSECUTOR]: What time did you advise him of his Miranda Rights?

[WITNESS]: We began at 1:15, 13:15 hours.

\* \* \*

[PROSECUTOR]: **And what did you do after you read [appellant] his Miranda Rights?**

[WITNESS]: I asked [appellant] if, in fact, he understood his rights. He indicated that he did. I asked if he would sign the first line which is the acknowledgment that says I have read or have had read to me this explanation of my rights. And [appellant] signed that.

[PROSECUTOR]: And what was the next thing that occurred?

[WITNESS]: The next thing that occurred was [appellant] asked if the guy died. And—

[PROSECUTOR]: What was your response?

[WITNESS]: And my response to that was, in fact, someone died. We are from the Homicide Unit or we wouldn't be having this conversation with him.

[PROSECUTOR]: Did he make an election as to continue the interview or speaking to you at that point?

[WITNESS]: At that point, he made a comment to the fact that he wasn't going to talk to us. As I started writing "Declined to be interviewed," on the Miranda form, which is what we do when someone chooses not to speak with us, [appellant] continued to speak.

[PROSECUTOR]: Did you, in fact, note, "Decline to be interviewed," on the form?

[WITNESS]: Yes, in fact, I did.

[PROSECUTOR]: And that appears on the signature line underneath the section that says, "Waiver of Miranda Rights," correct?

[WITNESS]: Yes, it does.

[PROSECUTOR]: Now you said he continued to speak to you at that point?

[WITNESS]: Yes, he did.

[PROSECUTOR]: What, if anything, did you do to initiate conversation?

[WITNESS]: Nothing. I was writing the "Declined to be interviewed," when [appellant] made the comment that all he did was take somebody to the hospital. And myself and Corporal Batchell explained to him,

you know, "We can talk to you but, you know, we'll listen to you as long as you want to talk with us, but we can't do that until you waived your Miranda Rights if you want to talk to us or have any further conversation, because we can't violate those rights.

[PROSECUTOR]: What did you do at that point?

[WITNESS]: At that point, [appellant] indicated that, in fact, he did want to speak to us. I took another Miranda form and again, went through his Miranda Rights with him again.

\* \* \*

[PROSECUTOR]: I show you what's been marked for identification as State's Exhibit 2 and ask if you can identify that document for the record.

[WITNESS]: Yes. This is also a Maryland State Police Form No. 180, Advice of Miranda Rights from 13:25 hours, 1:25 p.m.

[PROSECUTOR]: That is the second form that you used to advise [appellant] of his Miranda Rights?

[WITNESS]: That's correct. Yes, it is.

[PROSECUTOR]: **And did [appellant] sign off on that form ?**

[WITNESS]: **Yes, he did. He signed acknowledging that he had been read them and also he was read the paragraph—the waiver paragraph, and, in fact, he signed the waiver.**

[PROSECUTOR]: And his signature appears on the form?

[WITNESS]: Yes, it does.

\* \* \*

[PROSECUTOR]: **Now prior to his signing the form waiving his rights, what threats, if any, did you make to him at that point?**

[WITNESS]: **There were no threats made of any kind.**

\* \* \*

[PROSECUTOR]: **So the first Advice of Rights was 1:15 p.m. and the second one was 1:25 p.m.?**

[WITNESS]: **That's correct.**

[PROSECUTOR]: And again, you made no threats to him at that point?

[WITNESS]: No, we did not.

[PROSECUTOR]: At any time, did you display your weapon to him?

[WITNESS]: No, we did not.

[PROSECUTOR]: How were you dressed that day?

[WITNESS]: I would have been dressed in civilian clothes, much as I am today. When we talk with—when we are interviewing someone who is a suspect, our weapons are actually removed and they are locked up in a lockbox or the trunk of our car. One or the other.

[PROSECUTOR]: And at that point it was just you and [Cpl.] Batchell?

[WITNESS]: That's correct.

[PROSECUTOR]: How was [Cpl.] Bachtell dressed?

[WITNESS]: He would also have been in civilian plain clothes.

[PROSECUTOR]: Where would his weapon have been?

[WITNESS]: It would have either been secured in a lockbox at the barrack or in the trunk of his car.

[PROSECUTOR]: What promises, if any, did you make to [appellant] to have him speak to you?

[WITNESS]: None. No promises were made.

\* \* \*

[PROSECUTOR]: Now did there come a time during the interview that you played a portion of [Jackson's] statement?

[WITNESS]: Yes, there did.

[PROSECUTOR]: Why did you do that?

[WITNESS]: There came a point in the interview where I explained to [appellant] that, in fact, [Jackson] had identified him as the shooter.

[PROSECUTOR]: And what did you do? What was [appellant's] response at that point?

[WITNESS]: [Appellant] did not believe, and indicated that, in fact, that I had lied to him, and, in fact, had told him that [Jackson] was deceased.

[PROSECUTOR]: And what did you do then?

[WITNESS]: And I reiterated to [appellant] that, in fact, I had not lied to him. I had never specifically said who was deceased, that I had just told him at the beginning of the interview that, in fact, someone was dead and named no specific name.

[PROSECUTOR]: Now was it at that point that you played the portion of the Jackson interview?

[WITNESS]: Yes. When [appellant] still appeared that he did not believe that, in fact, that was true, I played approximately 10 seconds of the interview. Just enough of the interview to let [appellant] hear [Jackson] claiming that, in fact, [appellant] was the shooter.

[PROSECUTOR]: And what, if anything, did he say after you played that portion of the Jackson interview.

[WITNESS]: At that point he was angry. More so, at that point, he was angry with [Jackson]. He went on to tell us that there was a moral code and that basically no one was supposed to talk to the police.

\* \* \*

[PROSECUTOR]: Now approximately what time did the interview end?

[WITNESS]: At approximately, I believe, 14:55.

[PROSECUTOR]: Which would be what time?

[WITNESS]: Which would be 2:55 p.m.

[PROSECUTOR]: What happened to the defendant at that point?

[WITNESS]: At that point, the defendant was placed back into the holding cell.

(Emphasis added).

On cross-examination, Sgt. Becker elaborated on what happened after appellant invoked his right to silence:

[DEFENSE COUNSEL]: So did you take that no as that [appellant] invoked his right to silence?

[WITNESS]: I did. I write, "Declined to be interviewed," on the Miranda.

[DEFENSE COUNSEL]: So I guess about 13:16 he already invoked his right to silence, correct?

[WITNESS]: That's correct.

[DEFENSE COUNSEL]: So at that point in time, did you get up as [appellant] was asking questions?

[WITNESS]: Did I get up?

[DEFENSE COUNSEL]: Did you get up from your seat?

[WITNESS]: No. I was still writing, "Declined to be interviewed," when [appellant] was continuing to speak to Corporal Bachtell and myself.

[DEFENSE COUNSEL]: So as [appellant] continued to speak to you and Corporal Bachtell, you immediately began to read the second Advice of Rights to him, correct?

[WITNESS]: No. There was discussion[ ] with [appellant]. **[Appellant] continued to speak after he made the comment that he didn't want to speak to us. I was writing, "Declined to be interviewed." [Appellant] continued to speak to us during that time.**

I mean, obviously, **he had already said he didn't want to speak to us, and at that point in time, Corporal Bachtell and myself cut [appellant] off and said, "We can talk to you as much as you want to talk to us, but, in fact, we have to, you know, we have to advise you of your rights, and you have to be willing to waive those rights if, in fact, you want to speak to us."**

There was, I would say, probably easily 5 to 10 minutes of conversation for him to understand that, you know, we would listen to whatever he had to say. We were willing to talk to him as long as he wanted to talk to us, but that, in fact, he needed to understand his Miranda Rights, and we were not going to violate those and he had to, in fact, waive those.

\* \* \*

[DEFENSE COUNSEL]: **So you continued to talk to [appellant]? There was never a break in communication between you and [appellant] when he invoked his right to remain silent, was there?**

[WITNESS]: **[Appellant] continued to talk to us.**

[DEFENSE COUNSEL]: There was never a break in communication between you and [appellant] and [Cpl.] Bachtell once he invoked his right to remain silent, correct?

[WITNESS]: [Appellant] continued to speak to [Cpl.] Bachtell and myself as I was writing, "Declined to be interviewed."

[DEFENSE COUNSEL]: **I'm asking this a third time. There was never a break in communication between you and [appellant] and Corporal Bachtell, correct?**

[WITNESS]: **No, there was not.**

(Emphasis added).

On re-direct examination of Sgt. Becker, the prosecutor confirmed that Sgt. Becker and Cpl. Bachtell did not question appellant during the approximate ten-minute time period from when appellant invoked his right to remain silent and the second advisement of *his Miranda* rights:

[PROSECUTOR]: And how many times while after you advised him in writing, "Declined to be interviewed," did you initiate questions to [appellant]?

[WITNESS]: Never.

[PROSECUTOR]: How about Corporal Bachtell, did he initiate any questions?

[WITNESS]: No, there were no questions.

[PROSECUTOR]: No questioning during that time?

[WITNESS]: There was no questioning during this time.

[PROSECUTOR]: So he continues to speak, and it is at that time that you then do the second advisement of rights?

[WITNESS]: That's correct.

[PROSECUTOR]: So within a 10 minute period, he is now being advised a second time of his Miranda rights?

[WITNESS]: That's correct.

Appellant also testified at the suppression hearing. The trial court summarized appellant's testimony in its Memorandum Opinion and Order, filed on May 13, 2009:

[Appellant's] memory of the first interrogation is somewhat different than Sgt. Becker's. [Appellant] acknowledged that he understood his *Miranda* rights, and that after he initially refused to make a statement, Sgt. Becker told him that Damon Jackson accused [appellant] of shooting him and [Zurita]. [Appellant] said he signed the *Miranda* waiver because he felt that he was falsely accused and had to defend himself. He also stated that Sgt. Becker played a recorded copy of Jackson's statement in which Jackson stated that [appellant] shot him and [Zurita]. According to [appellant], he was given his second *Miranda* waiver after hearing Jackson's recorded statement.

In denying appellant's motion to suppress, the trial court made the following relevant findings of fact and conclusions of law:

In the case *sub judice*, Sgt. Becker stated that although [appellant] initially invoked his right to remain silent, he continued to speak while she was completing the MSP Advice of Rights form. She testified that [appellant], without being solicited, stated that all he did was to take a guy to the hospital and later asked whether or not the guy died. Sgt. Becker testified that the ten minute conversation that followed [appellant's] invocation of his *Miranda* [rights] was

initiated by [appellant], and that during that time, she and [Cpl.] Bachtell explained to him that they could not talk to him without a *Miranda* waiver. Despite [appellant's] assertions to the contrary, the suppression hearing transcript shows her testimony to be consistent in this regard.

On the other hand, [appellant] testified that after he declined to be interviewed, he was advised by Sgt. Becker that Jackson told the police that [appellant] shot Zurita. After [appellant] told Sgt. Becker and [Cpl.] Bachtell that he did not believe them, they played a tape with Jackson's recorded accusations. He further stated that "... when I heard the tape saying I shot him ... that's when I agreed to sign the form and talk to them." When asked why he decided to speak to the police, [appellant] stated that he "... felt like he was lied on ... when I heard the statements of me being accused of doing something I didn't do, I spoke." Notwithstanding [appellant]'s claim that Jackson's statement was played immediately after he invoked his right to remain silent, he subsequently indicated that he was not re-advised of his *Miranda* rights after the tape was played. [Appellant]'s contention that he was not re-advised could give rise to an inference that the tape was not played until after he was given a second *Miranda* warning which would be consistent with Sgt. Becker's testimony.

[Appellant] argues that the absence of a reasonable period of time between his invocation of his right to remain silent and the execution of his waiver of his *Miranda* rights is evidenced by Sgt. Becker's admission that she "... never got out of her chair, never left the room, never had a break in communications with [appellant], and did not allow any type of cooling down period." However, the same set of facts would support Sgt. Becker's contention that it was [appellant] who initiated and continued the conversation after he earlier had invoked his rights.

If [appellant] reinitiated or continued discussion of the offense, which this court believes he did, then the police may question a suspect without regard to lapse of time between the election to remain silent and the reinitiated interroga-

tion. *See*[ ] *Raras v. State*, 140 Md.App. 132, 153 [780 A.2d 322] (2001); *Davis v. United States*, 512 U.S. 452, 458 [114 S.Ct. 2350, 129 L.Ed.2d 362] (1994). Moreover, as in the *Raras* case, the uncontroverted evidence establishes that at the start of the reinitiated interview, [appellant] was presented with and signed an Advice of Miranda Rights form waiving his *Miranda* rights. There is no credible evidence before the Court that [appellant's] statement was in any way coerced, or that his election to remain silent was in any way overborne by police conduct. [Appellant] in fact acknowledged that he voluntarily signed the Maryland State Police Advice of Miranda Rights form.

## Standard of Review

In *Lee v. State*, 418 Md. 136, 12 A.3d 1238 (2011), the Court of Appeals set forth the standard to be applied when reviewing a trial court's disposition of a motion to suppress evidence:

In undertaking our review of the suppression court's ruling, we confine ourselves to what occurred at the suppression hearing. We view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion, here, the State. We defer to the motions court's factual findings and uphold them unless they are shown to be clearly erroneous. We, however, make our own independent constitutional appraisal, by reviewing the relevant law and applying it to the facts and circumstances of this case.

*Id.* at 148–49, 12 A.3d 1238 (citations and quotations omitted).

## Analysis

■ Appellant's argument centers on the admissibility of the statements that he made during the first interview with Sgt. Becker and Cpl. Mann. After appellant argues that these statements should have been suppressed, appellant contends that, "[i]f the original waiver of the right to remain silent was improper, then the subsequent interview and [recorded] statement taken in the afternoon by Cpl. Mann remained tainted and should be suppressed as well." Thus we will focus our

analysis on the admissibility of the statements that appellant made during the first interview.

Appellant argues that the trial court erred in denying his motion to suppress, because appellant's "right to cut off questioning" was not "scrupulously honored," in violation of the Supreme Court's opinion in *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). According to appellant, *Mosley* "distinctly sets the framework by which *Miranda* can be satisfied in [an] interrogation after the right to remain silent has been invoked." Appellant points to the four factors in *Mosley* that are to be considered in determining whether a defendant's right to cut off questioning has been scrupulously honored: "that the police '[1] immediately ceased the interrogation, [2] resumed questioning only after the passage of a significant period of time [more than two hours] and [3] the provision of a fresh set of warnings, and [4] restricted the second interrogation to a crime that had not been a subject of the earlier interrogation.'" *Id.* at 106, 96 S.Ct. 321 (alterations by appellant).

With respect to the first two factors, appellant contends that there was "never a break in communication" between Sgt. Becker, Cpl. Bachtell, and appellant during the first interview, and that the officers did not attempt to cease the interview after appellant invoked his right to remain silent. Additionally, appellant claims that "at best 9 minutes passed before [appellant] was explicitly asked to waive his right to remain silent." Appellant therefore argues that "little to no time" passed before the officers resumed questioning, far shorter than the two hours of time that passed between the two interviews in *Mosley*.

Regarding the third factor, appellant concedes that he did sign a *Miranda* waiver "a mere 10 minutes" after invoking his right to remain silent, and that this fact does not weigh against the State. As to the final factor, appellant points out that the subsequent questioning related to the same homicide and therefore was not related to another crime. Because the totality of the circumstances indicate that his right to cut off

questioning was not scrupulously honored, appellant concludes that his statements should not have been admitted at trial.

The State responds that an analysis of the factors in *Mosley* as applied to the instant case is "wholly unnecessary," because appellant reinitiated contact with the police and thus waived his previously invoked right to silence. In particular, the State contends that, because appellant initiated further communication with the police, "there was no need ... for the police to 'break off communications,' 'allow [for] the passage of a sufficient amount of time,' [or] 'restrict the second interrogation to a crime that had not been a subject of the earlier interrogation.'"

Appellant relies heavily on *Mosley*, a case in which the Supreme Court addressed the extent to which the police may reinitiate interrogation of a suspect after the suspect invokes his or her right to remain silent. In that case, Mosley was arrested for two robberies and was brought to the police department, where he was advised of his *Miranda* rights and signed the police department's constitutional rights notification certificate. 423 U.S. at 97, 96 S.Ct. 321. When police began questioning Mosley regarding one of the robberies, he indicated that he did not want to answer any questions. *Id.* The police ceased interrogation and took Mosley to his cell. *Id.*

Approximately two hours later, another officer brought Mosley to a different room for questioning about a homicide that was unrelated to the robberies. *Id.* at 97–98, 104, 96 S.Ct. 321. Prior to this questioning, the officer advised Mosley of his *Miranda* rights and Mosley once again signed the notification certificate. *Id.* at 98, 96 S.Ct. 321. This time, however, Mosley chose to speak with the police about the homicide and made a statement implicating himself in the crime. *Id.* Mosley was subsequently charged in the homicide and sought to suppress the incriminating statement, which the trial court denied. *Id.* at 98–99, 96 S.Ct. 321. On appeal to the Michigan Court of Appeals, Mosley argued that the statements that he made during the second interrogation violated

his Fifth Amendment rights, because the police questioned him after his initial invocation of his right to remain silent. *Id.* at 99, 96 S.Ct. 321. The Michigan Court of Appeals reversed Mosley's conviction on the ground that the second interrogation was a *"per se* violation of the *Miranda* doctrine." *Id.* Further appeal was denied by the Michigan Supreme Court. *Id.*

The Supreme Court of the United States vacated the judgment of the Michigan Court of Appeals. *Id.* at 107, 96 S.Ct. 321. In doing so, the Court held that no "passage in the *Miranda* opinion can sensibly be read to create *a per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." *Id.* at 102–03, 96 S.Ct. 321. The Court enunciated the following rule: "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104, 96 S.Ct. 321. The Court found that Mosley's right to remain silent was in fact "scrupulously honored," because *"the police* here immediately ceased the interrogation, *resumed questioning* only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." *Id.* at 106, 96 S.Ct. 321 (emphasis added).

In the case *sub judice,* it was appellant, not the police, who resumed the conversation following appellant's invocation of his right to remain silent. Sgt. Becker testified that appellant "continued to speak" as she was writing "Declined to be interviewed." According to Sgt. Becker, appellant then said that "all he did was take somebody to the hospital." After appellant made this comment, Sgt. Becker testified that she explained to him that they could not talk to him until he waived his *Miranda* rights. Indeed, Sgt. Becker stated that there was "easily 5 to 10 minutes of conversation for [appellant] to understand that." Appellant then "indicated that, in fact, he did want to speak" to Sgt. Becker and Cpl. Bachtell.

Sgt. Becker took out a second Advice of Miranda Rights form and went over appellant's rights with him again. Appellant signed the form, acknowledging that he had been read his rights, and this time also signed that he waived those rights.

The second advice of rights was signed ten minutes after the first advice of rights, at 1:25 p.m. During this ten-minute time period, Sgt. Becker stated that neither she nor Cpl. Bachtell initiated any questions to appellant, and that appellant "continued to speak nonstop."

The trial court found Sgt. Becker's testimony regarding appellant's reinitiation of communication to be credible. The trial court stated:

> **If [appellant] reinitiated or continued discussion of the offense, which this court believes he did,** then the police may question a suspect without regard to lapse of time between the election to remain silent and the reinitiated interrogation. *See*[ ] *Raras v. State*, 140 Md.App. 132, 153 [780 A.2d 322] (2001); *Davis v. United States*, 512 U.S. 452, 458 [114 S.Ct. 2350, 129 L.Ed.2d 362] (1994). Moreover, as in the *Raras* case, the uncontroverted evidence establishes that at the start of the reinitiated interview, [appellant] was presented with and signed an Advice of Miranda Rights form waiving his *Miranda* rights.

(Emphasis added).

We agree with the State that *Mosley* does not govern the admissibility of appellant's statements to the police, because it was appellant himself who reinitiated the conversation with the police after he invoked his right to remain silent. Moreover, we hold that the statements made by appellant after the reinitiation of conversation with police did not violate his Fifth Amendment right to remain silent under *Miranda*. We shall explain.

In *Raras v. State*, the appellant was arrested in connection with conspiracy and solicitation to commit murder, and arrived at the police station between 3:00 and 3:15 p.m. 140 Md.App. 132, 142–43, 780 A.2d 322, *cert. denied*, 367 Md. 90, 785 A.2d 1292 (2001). The appellant was placed in an interview room

and advised that the police knew that she had hired a man named Tickles to kill her daughter-in-law and that she was being charged with conspiracy and solicitation to commit murder. *Id.* at 143, 780 A.2d 322. The appellant responded that she wanted to speak with an attorney. *Id.* At 3:30 p.m., two police officers advised the appellant of her *Miranda* rights, and she signed an advice of rights form indicating that she was not waiving her rights. *Id.* at 144, 780 A.2d 322.

However, as the appellant was walking with two detectives to the booking area, she informed one of the detectives that she wanted to speak to him to " 'clarify' something regarding the charges." *Id.* at 144–45, 780 A.2d 322. The appellant and the two detectives returned to the interview room where one detective recounted with appellant, for recording purposes, what had happened in the booking area, and that she now wanted to speak with him. *Id.* at 145–147, 780 A.2d 322. At 4:45 p.m., the appellant signed another advice of rights form and waived her right to counsel and right to remain silent. *Id.* at 148, 780 A.2d 322. Subsequent to this waiver, she made a statement that she sought to suppress. *Id.* at 150–51, 780 A.2d 322.

On appeal, the appellant did not dispute that she had been properly advised of her rights to counsel and to remain silent pursuant to *Miranda.* *Id.* at 153, 780 A.2d 322. The appellant argued that, "because she invoked both rights during the first interview, any statement she made thereafter was automatically inadmissible." *Id.* This Court pointed out that the appellant herself admitted that she had asked to speak to a detective after the first interview "to clarify certain matters," and that the evidence showed that, prior to the second interview, "[the] appellant signed an advice of rights form waiving her *Miranda* rights." *Id.* at 153–54, 780 A.2d 322. Citing to *Mosley* and similar cases, we observed that "[i]t is beyond dispute that police may reinitiate discussion with a suspect who has invoked his or her right to remain silent if a significant period of time has elapsed and if the police have re-advised the suspect of his or her rights." *Id.* at 154, 780 A.2d 322. In addition, we stated that "police may question a

suspect who has invoked his or her right to counsel if it was the suspect who reinitiated discussion of the offense." *Id.* (citing *Davis v. United States,* 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)); *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Johnson v. State,* 348 Md. 337, 349–50, 703 A.2d 1267 (1998). Accordingly, we held the appellant's statements, which she made after she had waived her *Miranda* rights, were not rendered inadmissible by a prior invocation of her right to counsel and right to remain silent where the appellant had reinitiated a discussion of the offense with the police. *Id.* at 154–55, 780 A.2d 322.

In the case *sub judice,* appellant argues that *Raras* is inapplicable, because it does not "stand for the proposition that the invocation of a right to remain silent is essentially waived by the suspect if the suspect reinitiates the discussion." Appellant compares two statements we made in *Raras,* 140 Md.App. at 154, 780 A.2d 322: (1) "[i]t is beyond dispute that police may reinitiate discussion with a suspect who has invoked his or her *right to remain silent* if a significant period of time has elapsed and if the police have re-advised the suspect of his or her rights," and (2) "[i]n addition, police may question a suspect who has invoked his or her *right to counsel* if it was the suspect who reinitiated discussion of the offense." (Emphasis added). Appellant is mistaken.

From a factual standpoint, *Raras* clearly involved the appellant's invocation of both the right to counsel and the right to remain silent, the appellant's reinitiation of the conversation with police after the interview had stopped, and the appellant's subsequent waiver of those rights after being re-advised of her *Miranda* rights. *Raras,* 140 Md.App. at 143–45, 153–54, 780 A.2d 322. Thus our holding that the admission of appellant's statements did not violate her Fifth Amendment rights under *Miranda* applied to both the right to counsel and the right to remain silent.

Moreover, there is no language in the *Raras* opinion indicating that a different standard applied when a suspect's reinitia-

tion of conversation with police occurred after the invocation of the right to remain silent, as opposed to the invocation of the right to counsel. Finally, absent the appellant's reinitiation of conversation with police, the appellant's statements to the police probably would not have satisfied the *Mosley* test. The police ceased interrogation upon the appellant's invocation of her right to remain silent and re-advised her of her *Miranda* rights before the second interview. *Id.* at 143–45, 148, 780 A.2d 322. The police, however, resumed the interview in less than two hours (one hour and fifteen minutes to be precise) and did not restrict the questioning to a crime that had not been a subject of the earlier interrogation. *Id.* at 148–50, 780 A.2d 322. Although we did not expressly state in *Raras* that a suspect's reinitiation of conversation with the police after the invocation of the right to remain silent is an exception to the *Mosley* test, we clearly implied it.

Appellant, nonetheless, contends that "the rules regarding requesting counsel and invoking silence are *different*," and that the "two rights are distinct." Appellant is partially correct. The Supreme Court has articulated both different and similar standards regarding the invocation of the right to remain silent and the right to counsel.

As previously discussed, in *Mosley,* the Court held that police "scrupulously honored" the suspect's "right to cut off questioning" and thus did not violate Mosley's right to remain silent, where the police waited for over *two hours* before resuming questioning. 423 U.S. at 104, 96 S.Ct. 321. In *Edwards,* the Court held that, if a suspect invokes his or her right to counsel, police must cease interrogation until counsel is provided or the suspect reinitiates "further communication, exchanges, or conversations with the police." 451 U.S. at 484–85, 101 S.Ct. 1880. The Court in *Maryland v. Shatzer,* 559 U.S. 98, 104, 106, 110, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010), clarified that *Edwards* was a "judicially crafted rule," and that the presumption from *Edwards*—the suspect's waiver of *Miranda* rights after the invocation of the right to counsel is involuntary—is inapplicable when a suspect has experienced a *fourteen-day* break in custody. Based on these two temporal

standards, it is clear that the police's ability to re-interrogate a suspect following his or her invocation of the right to counsel is noticeably *more* restricted than with an invocation of the right to remain silent.

■ By contrast, both the right to counsel and the right to remain silent require an unambiguous invocation by the suspect. *See Berghuis v. Thompkins,* 560 U.S. 370, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010) (holding that a suspect who wants to invoke his or her right to remain silent must "do so unambiguously"); *Davis,* 512 U.S. at 459, 114 S.Ct. 2350 (holding that a suspect must "unambiguously request counsel"). In *Berghuis,* the Court explained that there was "no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel." 130 S.Ct. at 2260.

■ Appellant concedes that under *Davis* and its progeny, where a suspect has requested counsel, the police are barred from further interrogation until or unless (1) counsel is present, (2) the suspect reinitiates communication with the police, or (3) there is at least a fourteen day break in custody. *See Davis,* 512 U.S. at 458, 114 S.Ct. 2350 ("But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation."); *Edwards,* 451 U.S. at 484–85, 101 S.Ct. 1880 ("We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."); *Johnson,* 348 Md. at 350, 703 A.2d 1267 (" '[When] an individual in custody requests an attorney, interrogation must cease until an attorney is present, unless the accused himself initiates further communication, exchanges, or conversations with the police.' ") (emphasis omitted) (citations omitted); *Raras,* 140 Md.App. at 153–54, 780 A.2d 322.

■ We see no reason to distinguish between the right to counsel and the right to remain silent on the issue presented in the instant case, namely, whether appellant's right to remain silent was violated when appellant invoked his right to remain silent, reinitiated conversation with police, and the police resumed questioning appellant. Our sister jurisdictions have come to the same conclusion on this issue. *See, e.g., Morgan v. State,* 275 Ga. 222, 564 S.E.2d 192, 195 (2002) (holding that the trial court did not err in admitting the suspect's statements to police, where the suspect "himself initiated his statement, after previously expressing a different desire, thereby 'clearly evincing his intent not to remain silent' "); *Cruz v. State,* 715 So.2d 1117, 1118 (Fla.Dist.Ct.App. 1998) (upholding the trial court's admission of the confessions appellant gave after he invoked his right to silence because "the right to remain silent can be waived where a defendant voluntarily chooses to reinitiate contact with the police"); *Jackson v. State,* 2011 Ark. App. 738, 387 S.W.3d 203, 211 (2011) (holding that because "Jackson initiated the contact, [the detective] was not required to honor Jackson's earlier decision to remain silent"). Thus we hold that the police may question a suspect who reinitiates communication, exchanges, or conversations with the police following an invocation of his or her right to remain silent. What we said implicitly in *Raras* we now explicitly hold here.

■ Our analysis is not complete, because we must determine next whether appellant knowingly and voluntarily waived his right to remain silent under *Miranda. See Lee,* 418 Md. at 151, 12 A.3d 1238. Such inquiry involves the following considerations:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if "the totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the

requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* at 150, 12 A.3d 1238 (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).

At the suppression hearing, appellant did not claim that the waiver of his *Miranda* rights was not knowing. Instead, appellant asserted that what led him to speak to the police officers was their playing Jackson's recorded statement accusing appellant of being the shooter immediately after appellant signed the first advice of *Miranda* rights form and invoked his right to remain silent. Sgt. Becker, however, testified that she never played the recording prior to giving appellant the second advice of his *Miranda* rights. Instead, Sgt. Becker claimed that the recording was played "near the end of the interview after there was a conversation about [appellant's] place of employment. The trial court found appellant's testimony not credible, and noted the inconsistencies in his testimony:

> Notwithstanding [appellant's] claim that Jackson's statement was played immediately after he invoked his right to remain silent, he subsequently indicated that he was not re-advised of his *Miranda* rights after the tape was played. **[Appellant's] contention that he was not re-advised could give rise to an inference that the tape was not played until after he was given a second *Miranda* warning which would be consistent with Sgt. Becker's testimony.**

(Emphasis added).

Apart from appellant's testimony, which the trial court found not credible, there is no evidence that appellant was coerced into reinitiating conversation with the police officers, or that his statements were otherwise involuntary. Appellant "continued to speak nonstop" after signing his first advice of *Miranda* rights form. After appellant reinitiated communication with the police officers, the police "cut [appellant] off" and explained that appellant needed to waive his *Miranda* rights if he wanted to speak to them. Approximately ten minutes after signing his first advice of *Miranda* rights form, during which

appellant "was never quiet" and "[t]here was never a break in communication," "[appellant] was presented with and signed an Advice of Miranda Rights form waiving his *Miranda* rights." Thereafter, Sgt. Becker "opened it up to [appellant] and said at that point [appellant] was free to tell [the police officers] whatever [appellant] wanted to tell [the police officers]." It was then that appellant provided a statement to the officers. Thus the record clearly supports the conclusion reached by the trial court that appellant's waiver of his *Miranda* rights, after being advised of them a second time, was knowing and voluntary.

In sum, because the evidence, viewed in the light most favorable to the State, shows that appellant invoked his right to remain silent, then reinitiated conversation with the police, and thereafter knowingly and voluntarily waived his right to remain silent, the trial court did not err in denying appellant's motion to suppress the statements that he made to the police.

## II.

### Merger

■ Appellant argues that the trial court erred in failing to merge for sentencing purposes his conviction for robbery with a dangerous weapon into his conviction for felony murder. According to appellant, the "underlying felony of a felony murder conviction is the same offense and not subject to multiple punishments for double jeopardy purposes." The State agrees with appellant that the trial court erred in failing to merge for sentencing purposes appellant's conviction for robbery with a dangerous weapon into his conviction for felony murder. The State adds, however, that the appropriate relief for this error is vacating appellant's *sentence* for armed robbery; not his *conviction* for armed robbery.

■ Upon our own independent review of the relevant case law, we conclude that the trial court erred in failing to merge the armed robbery and felony murder convictions for sentencing purposes. In *Newton v. State,* 280 Md. 260, 268, 373 A.2d 262 (1977), the Court of Appeals articulated the "required

evidence test," which is used to determine whether a conviction for one offense should be merged into a conviction for another offense:

If each offense requires proof of a fact which the other does not, the offenses are not the same and do not merge. However, if only one offense requires proof of a fact which the other does not, the offenses are deemed the same, and separate sentences for each offense are prohibited.

The Court of Appeals further explained the Court's holding in *Newton* in *Borchardt v. State*, 367 Md. 91, 142–43, 786 A.2d 631 (2001) (emphasis added), *cert. denied*, 535 U.S. 1104, 122 S.Ct. 2309, 152 L.Ed.2d 1064, *and reh'g denied*, 536 U.S. 978, 123 S.Ct. 11, 153 L.Ed.2d 875 (2002):

**In *Newton*, we concluded that felony murder and the underlying felony must be treated as one offense for double jeopardy purposes and that, for sentencing, the underlying felony must merge into the murder.** That is because felony murder contains every element contained in the underlying felony and therefore does not present the situation in which each offense contains an element not found in the other. **We also made clear, however, that if a first degree murder conviction is based on independent proof of premeditation and deliberation, the murder, even if committed in the course of a felony, would not be deemed the same offense as the felony and there would therefore be no merger.** In [*State v.*] *Frye* [283 Md. 709, 393 A.2d 1372 (1978) ], we held that, whether a merger is required depends on the basis for the jury's verdict on the murder count: **"The convictions and sentences for the underlying felonies ... are supportable if the juries found wilful, deliberate and premeditated killings but are not supportable if the murder verdicts rested upon the felony murder theory."** [*Id.*]

In the case *sub judice*, appellant moved at trial for a judgment of acquittal on the charge of first degree premeditated murder, and the State did not oppose the motion. The trial court granted appellant's motion, thus negating any

"independent proof" of premeditation or deliberation. Based on the holdings in *Newton* and *Borchardt,* we conclude that the trial court erred in failing to merge appellant's conviction for the underlying felony, robbery with dangerous weapon, into his conviction for felony murder. We also agree with the State that only the sentence for robbery with a dangerous weapon is vacated; merger does not affect the underlying conviction. *See Moore v. State,* 198 Md.App. 655, 689, 18 A.3d 981 (2011) (stating that "where the convictions for two offenses merge under the required evidence test, the doctrine of merger allows only the imposition of a sentence on the greater offense; the *convictions* for both offenses stand inviolate, unaffected by the merger") (citation and quotations omitted).

## III.

### *Voir Dire*

During the questioning of the venire, the trial court asked the following question:

Has any member of the jury panel, or has any member of your immediate family, ever been involved in any criminal case either as a witness for the State, a witness for the defense, a victim of a crime, or as a defendant in a criminal case? If so, please stand.

At that point, a woman named Sheilah Simberg stood and was identified by the clerk as juror Number 58. Simberg, however, was actually juror Number 57, and was never asked about her response to that question during a follow-up interview at the bench. Kristen Simms, who was actually juror Number 58, was asked for a response to this question at her follow-up interview. Defense counsel never objected to the court's failure to obtain a response from Simberg to the subject question, nor was the oversight brought to the attention of the court. The defense struck Simms from the jury, and Simberg was placed on the jury.

Recognizing his failure to object, appellant argues that the trial court committed plain error by failing to ask Simberg to what extent she, or someone in her family, had been involved

with a criminal case. Because the trial court did not follow-up with Simberg as a result of an error made by the clerk, appellant argues that he was "denied the opportunity to properly effectuate *voir dire.*" Appellant concludes that this error prevented him from having a fair and impartial trial, and requests that this Court vacate his conviction and remand the case for a new trial.

In response, the State argues that appellant has not shown any cognizable error, let alone plain error. According to the State, "where a defendant seeks to challenge a juror after the jury has returned a conviction . . . that challenge will not be successful unless the defendant can demonstrate actual prejudice." The State contends that appellant failed to establish actual prejudice and is merely speculating as to any potential bias or prejudice on the part of Simberg.

The State further argues that, even if this Court finds that the trial court committed reversible error in failing to further question Simberg, plain error review would not be appropriate. The State contends that plain error review is only appropriate when the alleged error is " 'compelling, extraordinary, exceptional, or fundamental' in nature." *See Abeokuto v. State,* 391 Md. 289, 327, 893 A.2d 1018 (2006). The State points to several factors identified in *Morris v. State,* 153 Md.App. 480, 518–24, 837 A.2d 248 (2003), *cert. denied,* 380 Md. 618, 846 A.2d 402 (2004), that have guided discretionary exercises of plain error review: "1) 'The opportunity to utilize an unpreserved contention as a vehicle . . . for exploring some hitherto unexplored area of the law,' 2) 'The egregiousness of the error,' 3) 'The nature of the impact of the error' . . . and 4) 'Lawyerly diligence or dereliction.' "

With respect to these factors, the State asserts that review of this unintentional clerical error "would not advance the understanding of some unexplored area of law." The State further argues that the error was "far from egregious," and several parties—including defense counsel and the prosecutor—are to blame for failing to bring the error to the attention of the court. Regarding the third factor, the State contends

that appellant failed to show that he suffered actual prejudice, and the nature of the impact thus cannot be determined. Finally, the State claims that defense counsel was clearly not diligent, as the error was not brought to the attention of the trial court.

The Court of Appeals in *Davis v. State*, 333 Md. 27, 633 A.2d 867 (1993), elaborated on the purpose of a *voir dire* examination:

"The purpose of the voir dire examination is to ascertain the existence of cause for disqualification and for no other purpose. Neither mere acquaintance with an individual or group, nor mere relationship to witnesses, other than parties, is sufficient basis for challenging a prospective juror for cause. **Bias on the part of prospective jurors will never be presumed, and the challenging party bears the burden of presenting facts, in addition to mere relationship or association, which would give rise to a showing of actual prejudice."** (Citations omitted).

*Id.* at 37–38, 633 A.2d 867 (emphasis added) (quoting *Borman v. State*, 1 Md.App. 276, 279, 229 A.2d 440 (1967)).

As previously indicated, appellant concedes that defense counsel did not raise this issue at the trial level, but urges this Court to exercise plain error review. The Court of Appeals has defined plain error as an "error which vitally affects a defendant's right to a fair and impartial trial and [has] limited our review under the plain error doctrine to circumstances which are compelling, extraordinary, exceptional or fundamental to assure the defendant a fair trial." *Miller v. State*, 380 Md. 1, 29, 843 A.2d 803 (2004) (citations and quotations omitted). As a result, "appellate review under the plain error doctrine 1) always has been, 2) still is, and 3) will continue to be a rare, rare phenomenon." *Hicks v. State*, 189 Md.App. 112, 130, 984 A.2d 246 (2009) (citations and quotations omitted).

In order to obtain plain error review, a party must show that the trial court committed *reversible* error. In *Burkett v. State*, 21 Md.App. 438, 443, 319 A.2d 845 (1974), we

cited to the following language from an analogous case from the Tenth Circuit Court of Appeals:

> The court does not look favorably upon raising questions of possible prejudice on the part of a juror after the jury has returned a conviction. **In the absence of a showing of actual bias or an intentional withholding of the facts, there is little in the record from which the court can conclusively presume that the non-disclosure was obvious disqualification and inherent prejudice as a matter of law.** Whether [the] juror ... had any preconceived enmity, prejudice, or bias against defendant is a matter of supposition. *The fact that [the] juror ... might have been peremptorily challenged by defendant is not alone sufficient to reverse defendant's convictions.* Defendant is entitled to a fair trial, but not a perfect trial.

(Bold emphasis added) (citing *Williams v. United States*, 418 F.2d 372, 377 (10th Cir.1969)). Additionally, the party asserting bias on the part of a juror has the burden of presenting evidence "which would give rise to a showing of actual prejudice." *Hunt v. State*, 345 Md. 122, 146, 691 A.2d 1255 (1997) (citation omitted).

In the case *sub judice*, we need not reach plain error, because appellant failed to show reversible error arising out of actual bias on the part of Simberg. The question that Simberg answered in the affirmative would not have resulted in her automatic removal from the final jury. Of the twenty jurors who responded in the affirmative to the subject question, six of them ended up on the jury, seven were stricken for cause, six were struck by the defense, and two were struck by the state.[2] Although Simberg answered the question in the affirmative, appellant points to no evidence that the juror held any bias that was "reasonably liable to unduly influence" her, and this bias "will never be presumed." *See Davis*, 333 Md. at 38, 57, 633 A.2d 867 (1993) (citations omitted).

---

2. One juror did not respond affirmatively to the subject question during the collective questioning, but volunteered an answer to that question during the individual questioning.

Even if appellant demonstrated bias on the part of Simberg, we decline to exercise plain error review, because appellant has failed to show that the error was "compelling, extraordinary, exceptional, or fundamental" in nature. *Abeokuto*, 391 Md. at 327, 893 A.2d 1018. Appellant points to no evidence that the error was "egregious" in nature, and we can only speculate as to the nature of the impact of the error. *See Morris*, 153 Md.App. at 520–22, 837 A.2d 248.

## IV.

### Photograph

■■■ At trial, the State offered a photograph into evidence depicting the decedent, Zurita, with a young female family member.[3] According to the State, the photograph was offered into evidence to identify Zurita and to show that Zurita was wearing a gold chain that would later be recovered from appellant at the time of his arrest.

Although appellant concedes that the photograph "may have been relevant," he argues its probative value was substantially outweighed by the prejudicial effect of showing Zurita's family member in the photograph. Appellant further contends that the photograph was cumulative, because other photographs also showed the decedent wearing the gold chain. Finally, appellant asserts that the prejudicial effect of the photograph could have been "mitigated, if not eliminated," by altering the photo to remove appellant's niece or by relying solely on the other photographs. Appellant concludes that the trial court was "plainly arbitrary" in admitting the photograph into evidence.

In response, the State argues that the trial court did not abuse its discretion in admitting the photograph, because it was not unduly prejudicial. The State contends that the

---

**3.** In his brief to this Court, appellant asserts that the relationship between the young girl and Zurita is "unclear," but posits that the young girl in the photograph is Zurita's niece. The State points out that, following defense counsel's objection, Zurita's mother testified that the young girl in the photograph was Zurita's daughter.

photograph is "innocuous," and, as the trial court noted, "photographs will often depict the subject of the photograph with other family members" when the photograph is later used for a purpose not evident at the time it was taken.

The State further claims that the admission of the photograph was not cumulative, because it "present[ed] the jury with what the other two [photographs] d[id] not: a photograph from which the jury can identify the victim wearing the necklace." The State points out that the other photos of the necklace showed the victim "facing away from the camera," making his identity "unclear." Finally, the State contends that, because the State bears the burden of persuasion, it is allowed to "occasionally introduce evidence that is redundant." *See Lucas v. State*, 116 Md.App. 559, 573, 698 A.2d 1145, *cert. denied*, 348 Md. 206, 703 A.2d 148 (1997). Maryland Rule 5–403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." In *Ayala v. State*, 174 Md.App. 647, 923 A.2d 952 (2007), this Court set forth the general rule regarding the admission of photographs:

> "[T]he general rule regarding admission of photographs is that their prejudicial effect must not substantially outweigh their probative value. This balancing of probative value against prejudicial effect is committed to the sound discretion of the trial judge. The trial court's decision will not be disturbed unless 'plainly arbitrary,' . . . because the trial judge is in the best position to make this assessment.
>
> Photographs must also be relevant to be admissible. . . . The relevancy determination is also committed to the trial judge's discretion."

*Id.* at 679–80, 923 A.2d 952 (quoting *State v. Broberg*, 342 Md. 544, 552–53, 677 A.2d 602 (1996), *cert. denied*, 401 Md. 173, 931 A.2d 1095 (2007)).

In addition, the Court of Appeals in *Broberg* noted that "photographs may be relevant and possess probative value

even though they often illustrate something that has already been presented in testimony." 342 Md. at 553, 677 A.2d 602. On review, we will not disturb a trial court's determination that the probative value of a photograph is not substantially outweighed by unfair prejudice "unless plainly arbitrary." *Lucas*, 116 Md.App. at 572, 698 A.2d 1145.

In the case *sub judice*, the court engaged in the following colloquy with counsel at the bench regarding the photograph at issue:

[DEFENSE COUNSEL]: ... I've seen the discovery. I know the State had other photographs, frontal picture of the decedent without the granddaughter included in the photograph. **It's—I can't say that it's unduly prejudice, but I think it's an appeal to sympathy with regard to the granddaughter when the State has other evidence by which it can achieve the same purpose.**

[PROSECUTOR]: Only other photos I have of the victim with the chain are these photos, and it's part of a series of three photos, which is, in order to keep the consistency, it's the victim with the gray shirt and gold chain.

**In this photo he is walking away and you can't see his face for identification. And this photo is enlarged to show the gold chain. The intent is for identification.... I can't help that it's a family photo, but I don't have any other photos.**

THE COURT: First of all, **I find that the photos are relevant because there is an allegation that a gold chain was stolen in this case. And secondly, I find that it's not only relevant, but the probative value outweighs any prejudicial value. And the prejudice that may be shown by virtue of the fact that there are family photos, I don't find it—I think as you will have noticed, [defense counsel], it's not unduly prejudicial.**

It would be unrealistic to assume that this jury would put this matter in a vacuum in any event. There is bound to be some family photos of some family relationships in this

case. So I find that it's relevant, probative, and it's not unduly prejudicial. Overrule the objection.

(Emphasis added).

Based on the above colloquy, it is clear that the trial court weighed the danger of unfair prejudice of the photograph against its probative value. The State adduced evidence at trial that, when appellant was arrested, which was only a matter of hours after the murder of Zurita, appellant was in possession of a gold chain necklace that had been worn by Zurita on the night of the murder. The photograph in question showed Zurita wearing the necklace with his face clearly depicted. No other photograph showed Zurita's face with the necklace. Thus the trial court's determination that the danger of unfair prejudice of the photograph did not substantially outweigh its probative value was not plainly arbitrary, and we will not disturb this decision on appeal.

SENTENCE ON CONVICTION FOR ROBBERY WITH A DANGEROUS WEAPON VACATED; JUDGMENTS OF THE CIRCUIT COURT FOR HARFORD COUNTY AFFIRMED IN ALL OTHER RESPECTS; 75% OF COSTS TO BE PAID BY APPELLANT; 25% OF COSTS TO BE PAID BY HARFORD COUNTY.