REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2018

September Term, 2013

_____

SHAWN STEVENSON

v.

STATE OF MARYLAND

_____

Berger,
Nazarian,
Leahy,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: April 2, 2015

Shawn Stevenson was convicted in the Circuit Court for Baltimore City, after a jury trial, of first-degree murder, first-degree sexual offense, and two counts of wearing, carrying, or transporting a deadly weapon. On appeal, Mr. Stevenson challenges many of the circuit court's evidentiary rulings and argues that there was insufficient evidence to support his convictions. We find no error in any of the circuit court's rulings, hold that the evidence was sufficient, and affirm.

## I. BACKGROUND

At about 2:30 p.m. on April 23, 2012, Noi Sipayboun was found dead by her sister Sonmai Sipayboun ("Sister") in the bathtub at a home she owned with Mr. Stevenson at 5406 Hillburn Avenue in Baltimore City. Ms. Sipayboun had sustained three stab wounds and 13 cutting wounds and also had "injuries to the vagina and on the anus which . . . consisted of multiple bruises and tears and scratches."

At the time of Ms. Sipayboun's death, she and Mr. Stevenson had been romantically involved for thirteen years. The two were never married, but Mr. Stevenson was the beneficiary of a life insurance policy insuring Ms. Sipayboun's life. They had lived together for some time at 4425 Powell Avenue in Baltimore City with Sister and her two sons, but at the time of her death, Ms. Sipayboun was in the process of moving with the children to 5406 Hillburn Avenue, where she and Mr. Stevenson had lived previously. According to Sister, this was prompted by the tension between Ms. Sipayboun and Mr. Stevenson, who was angered by Ms. Sipayboun's decision to engage in an intimate relationship with another man, James Potter. During the week before Ms. Sipayboun's

death, Sister witnessed multiple violent altercations between Mr. Stevenson and Ms. Sipayboun and Ms. Sipayboun told her that Mr. Stevenson had tried to force her to have sex with him against her will.

In the morning of the day Ms. Sipayboun was killed, Sister overheard Ms. Sipayboun and Mr. Stevenson arguing. At around noon, Ms. Sipayboun called Sister "and told [her] that [Mr. Stevenson] had called her up and told her that she had to get all her stuff out of [5406 Hillburn Avenue] because the house was under contract and we couldn't move in there." As a result, Ms. Sipayboun asked Sister if she would come over and help move her belongings out of the house. After the phone call was finished, Sister was unable to reach Ms. Sipayboun by phone despite trying on several occasions. Sister did not have contact with Ms. Sipayboun again until she found her dead two hours later. Ms. Sipayboun's cell phone was not with her when she was discovered; police recovered it hours later from a storm drain near the 3500 block of North Point Road in Dundalk.

Baltimore City Police Detective Eric Ragland became the primary investigator into Ms. Sipayboun's death. He arrived on the scene at 3:51 p.m. and spoke with Sister and one of Ms. Sipayboun's neighbors. Detective Ragland determined that Ms. Sipayboun's injuries were not self-inflicted. He observed that there was no damage to the doors of the house, which suggested that Ms. Sipayboun was familiar with her perpetrator. Sister provided Detective Ragland with Mr. Stevenson's cell phone number, and Detective Ragland promptly enlisted the assistance of another detective to attempt to locate Mr. Stevenson.

2

Mr. Stevenson was eventually located and taken to police headquarters, where the police took pictures of his body as part of the investigation, including his swollen right hand. Detective Ragland also went to the store where Mr. Stevenson worked and determined that on the day that Ms. Sipayboun was killed, Mr. Stevenson arrived at work just before 8:00 a.m. and departed at 12:13 p.m., even though he had been scheduled to work from 5:00 a.m. to 3:00 p.m. on that date. In Detective Ragland's view, "[t]he evidence pointed to [Mr. Stevenson]" as the perpetrator.

During the investigation, Baltimore City Police Detective John Jendrek obtained "call detail records" for cell phones belonging to Mr. Stevenson, Ms. Sipayboun, and Sister. Based on his analysis of these records, Detective Jendrek determined that Mr. Stevenson's cell phone was located in the area of Hillburn Avenue, in close proximity to where Ms. Sipayboun was killed, between 1:30 p.m. and 2:45 p.m. on the day of the murder. In addition, Mr. Stevenson's cell phone was located in close proximity to North Point Road in Dundalk at 3:19 p.m., where Ms. Sipayboun's cell phone was found by police.

According to Mr. Stevenson, he left the Royal Farms store where he worked at around noon on the day Ms. Sipayboun was killed to drop off supplies to another Royal Farms store. While away from work, Mr. Stevenson went home and took a shower before going to the area of Golden Ring Mall to get a cake for his son's birthday. Mr. Stevenson stated emphatically that he did not go to 5406 Hillburn Avenue on that day and was not responsible for Ms. Sipayboun's death.

3

Mr. Stevenson was charged on June 28, 2012 with Ms. Sipayboun's murder and a number of other offenses. At the conclusion of an eight-day jury trial, Mr. Stevenson was convicted of first-degree murder, first-degree sexual offense, and two deadly-weapon counts. He noted a timely appeal.

## II. DISCUSSION

Mr. Stevenson argues that the circuit court erred in several evidentiary rulings and asserts that there was insufficient evidence to support his convictions.[1] We disagree.

---

[1] Mr. Stevenson presents the following questions for our review:

> 1. Did the hearing court err by denying Appellant's pre-trial motion to preclude the use of "cellular tower ping" evidence at trial?
>
> 2. Did the trial court err by permitting a State's witness, Detective John Jendrek, to be qualified as an expert witness?
>
> 3. Did the trial court commit reversible error by admitting testimony that cell phones belonging to Appellant, the murder victim, and Ms. Sipayboun's sister connected to specific cell phone towers?
>
> 4. Were the trial court's rulings admitting evidence of Appellant's prior bad acts erroneous?
>
> 5. Did the trial court abuse discretion by permitting the introduction of inadmissible hearsay during the testimony of LaShawn Stevenson?
>
> 6. Did the trial court err by admitting into evidence photographs of Appellant's hands?

4

**A.** **The Circuit Court Did Not Err By Admitting Cellular Tower "Ping" Evidence Without A *Frye-Reed* Hearing.**

At trial, Detective Jendrek was qualified as an expert in the fields of cell phone "certification, detail analysis, mapping and location." He testified that he had reviewed the "call detail records" for cell phones belonging to Mr. Stevenson, Ms. Sipayboun, and Sister and determined that Mr. Stevenson's cell phone had registered with a cell phone tower located near Hillburn Avenue from 1:40 p.m. to 2:45 p.m. on the date Ms. Sipayboun was killed. In other words, Detective Jendrek testified that Mr. Stevenson's cell phone was in the area where Ms. Sipayboun's body was found during the time she was killed. He testified further that Mr. Stevenson's cell phone registered with a cell phone tower near North Point Road in Dundalk at 3:19 p.m. that same day, which was in close proximity to where Ms. Sipayboun's cell phone was found by police later that day. In explaining how he was able to determine the cell phone tower with which Mr. Stevenson's cell phone had registered, Detective Jendrek testified that he determined which "cell site . . . provided the

---

7. Did the trial court's ruling permitting testimony that Appellant refused to give a DNA sample cause reversible error?

8. Did the trial court err by permitting Detective Kevin Allen to be qualified as an expert witness in the field of digital forensics?

9. Is the evidence legally insufficient to sustain Appellant's convictions?

cleanest, strongest available signal and as a general rule that is the cell site that's the closest to the cell [phone]."

Before trial, Mr. Stevenson made a motion *in limine* to exclude Detective Jendrek's testimony because, in his view, it was not generally accepted in the scientific community "that the location of a single cellular tower can accurately locate [a] cellular phone." Mr. Stevenson argued that the circuit court was required to conduct a *Frye*/*Reed* hearing to determine whether the technique the Detective employed to determine the location of his cell phone was generally accepted in the scientific community. In response, the circuit court found that "I'm not sure this is a *Frye/Reed* issue or that you've established it as a *Frye*/*Reed* [issue] simply by saying so," and decided not to conduct a *Frye*/*Reed* hearing because Mr. Stevenson was not offering an expert who could dispute the acceptance of the Detective's technique. Detective Jendrek's testimony was admitted at trial over objection.

In his brief, Mr. Stevenson contends that "the trial court erred by not conducting a *Frye*/*Reed* hearing to test the prosecutor's theory that a target cell phone can be located by the use of data identifying cell phone towers used during communication." The State counters that a *Frye*/*Reed* hearing was unnecessary because "cell phone location evidence is not novel scientific evidence." We agree and hold that the circuit court did not err in declining to hold a *Frye*/*Reed* hearing.

Maryland Rule 5-702 governs the admissibility of expert witness testimony and provides:

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

*Id.* "A trial judge has wide latitude in determining whether expert testimony is sufficiently reliable to be admitted into evidence, and his sound discretion will not be disturbed on appeal unless the decision to admit the expert testimony was clearly erroneous or constituted an abuse of discretion." *Montgomery Mut. Ins. Co. v. Chesson*, 399 Md. 314, 327 (2007) (citations omitted).

With regard to the admissibility of expert testimony regarding scientific evidence in particular,

Maryland adheres to the standard set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), for determining the admissibility of scientific evidence and expert scientific testimony. *Reed v. State*, 283 Md. 374, 389 (1978) (adopting the *Frye* standard). Under the *Frye-Reed* test, a party must establish first that any novel scientific method is reliable and accepted generally in the scientific community before the court will admit expert testimony based upon the application of the questioned scientific technique. *Wilson v. State*, 370 Md. 191, 201 (2002). A trial court may take judicial notice of the reliability of scientific techniques and methodologies that are widely accepted within the scientific community. *Reed*, 283 Md. at 380. A trial court also may take notice that certain scientific theories are viewed as unreliable, bogus, or experimental. *Id.* However, when it is unclear whether the scientific community accepts the validity of a novel scientific theory or methodology, we have noted that before testimony

7

based on the questioned technique may be admitted into evidence, the reliability must be demonstrated. *Wilson*, 370 Md. at 201. While the most common practice will include witness testimony, a court may take judicial notice of journal articles from reliable sources and other publications which may shed light on the degree of acceptance *vel non* by recognized experts of a particular process or view. *Reed*, 283 Md. at 380. The opinion of an "expert" witness should be admitted only if the court finds that "the basis of the opinion is generally accepted as reliable within the expert's particular scientific field." *Wilson*, 370 Md. at 201.

*Id.*

Mr. Stevenson argues that the circuit court abused its discretion in declining to hold a *Frye*/*Reed* hearing to determine whether the cell phone location technique employed by Detective Jendrek was generally accepted in the scientific community. But he offered no evidence or argument, in the circuit court or here, to support the contention that the technique employed by Detective Jendrek was "novel" or not generally accepted. He simply asserts that Detective Jendrek's testimony "should not have been admitted because it did not meet the standard applicable to expert testimony commonly referred to as the *Frye*/*Reed* standard" without providing any supporting evidence

Although it is true that a witness using telephone call detail data to locate someone must be qualified as an expert, *see State v. Payne & Bond*, 440 Md. 680 (2014), that does not mean that there is any dispute about the general acceptance of the underlying techniques. The *Frye*/*Reed* standard is only applicable to determinations of the admissibility of *novel* scientific evidence. *See Aventis Pasteur, Inc. v. Skevofilax*, 396 Md. 405, 431 n. 18 (2007) ("The [*Frye*/*Reed*] standard continues to be the standard by which

8

Maryland trial courts determine the admissibility of *novel* scientific evidence." (citation omitted) (emphasis added)); *CSX Transp., Inc. v. Miller*, 159 Md. App. 123, 186-87 (2004) ("It is only with respect to *new and novel* scientific techniques that a [*Frye/Reed*] assessment must be made . . . What is contemplated [by *Frye/Reed*] are *new, and arguably questionable*, techniques such as lie detector tests, breathalyzer tests, paraffin tests, DNA identification, voiceprint identification, as in the *Reed* case itself, and the use of polarized light microscopy to identify asbestos fibers." (emphasis added)).  The cell phone location evidence at issue here is not *novel* scientific evidence, so *Frye/Reed* is not applicable.

Our decision in *Wilder v. State*, 191 Md. App. 319 (2010), is instructive on this point.  In that case, we were asked to determine whether cell phone location evidence required the presentation of expert testimony.  *Id.* at 347.  Although the issue of whether a *Frye/Reed* hearing was required to admit such evidence was not specifically before us, "[w]e recognize[d] that cellular telephone technology has become generally understood [and] the use of telephone company cell phone records for investigative purposes has been noted in Maryland cases." *Id.* at 367 (citations omitted).  We even went so far as to endorse a procedure for admitting cell phone location evidence: "[W]e believe that the better approach [for admitting cell phone location evidence] is to require the prosecution to offer expert testimony to explain the functions of cell phone towers, derivative tracking, and the techniques of locating and/or plotting the origins of cell phone calls using cell phone records." *Id.* at 365; *see also Coleman-Fuller v. State*, 192 Md. App. 577, 619 (2010)

("[Cell phone location] evidence may only be introduced through a witness qualified as an expert.").

That is precisely how the State offered cell phone location evidence against Mr. Stevenson. Moreover, "the use of cell phone location records to determine the general location of a cell phone has been widely accepted by numerous federal courts." *United States v. Jones*, 918 F. Supp. 2d 1, 5 (D.D.C. 2013) (citations omitted). In the absence of any evidence that that the cell phone location technique employed by Detective Jendrek was not generally accepted in the scientific community, *Chesson*, 399 Md. at 327 ("[T]he most common practice [for a *Frye/Reed* hearing] will include *witness testimony*." (emphasis added)), the circuit court did not err in declining to conduct a *Frye/Reed* hearing here.

**B.     The Circuit Court Did Not Abuse Its Discretion In Qualifying Detective Jendrek As An Expert Witness.**

During trial, the State called Detective Jendrek as a witness and sought to have him qualified as an expert in the area of "call detail record analysis, call detail interpretation and cell site mapping." He testified that for the last five years, he had been assigned to the Advanced Technology Team, "the unit that handles – assists any detective or detective unit that needs help with cell phone information, be it obtaining the records from the provider or finding cell phones." He testified that during his time with the Advanced Technology Team, and during a previous stint with the DEA, he had received an extensive amount of training regarding cell phones and call detail records. Detective Jendrek attended several

10

courses regarding call detail records, which "included two separate classes that were related directly to mapping of cell site and call detail record interpretation and analysis." From 2009 to the time of trial, Detective Jendrek was invited to teach numerous classes about call detail record analysis. And significantly, he testified that he had worked on 1,500 cases involving cell phone location. Based on this testimony, the circuit court, over objection, accepted Detective Jendrek as an expert in the field of cell phone location:

> The Court upon review of the testimony and *voir dire* of the witness, based on his background, training and experience, his teaching, as well as his practical experience, the Court accepts the witness as an expert in the area and will allow him to testify in the area of cellular detail certification, detail analysis, mapping and location.

Mr. Stevenson argues that the circuit court erred in qualifying Detective Jendrek as an expert witness. In his view, Detective Jendrek should not have been qualified as an expert witness because (1) the Detective "had not studied telecommunications or network engineering in college[,] [r]ather, his undergraduate degree was in history;" (2) "[h]e had not published any articles involving the subjects for which he was offered as an expert;" and (3) "[a]ll of his experience was related to law enforcement."

Md. Rule 5-702 directed the circuit court, in determining whether to admit expert witness testimony, to determine "whether the witness is qualified as an expert by knowledge, skill, experience, training, or education." *Id.* "It is well settled in Maryland that Rule 5-702 vests trial judges with wide latitude in deciding whether to qualify a witness as an expert or to admit or exclude particular expert testimony." *Massie v. State*, 349 Md.

11

834, 850-51 (1998) (citations omitted). "The admissibility of expert testimony is within the discretion of the trial court, and therefore, the circuit court's decision to admit expert testimony 'will seldom constitute a ground for reversal.'" *Donati v. State*, 215 Md. App. 686, 742, *cert. denied*, 438 Md. 143 (2014) (quoting *Bryant v. State*, 393 Md. 196, 203 (2006)). "The trial court is free to consider any aspect of a witness's background in determining whether the witness is sufficiently familiar with the subject to render an expert opinion, including the witness's formal education, professional training, personal observations, and actual experience." *Massie*, 349 Md. at 851 (citations omitted). And "[t]o qualify as an expert, one need only possess such skill, knowledge, or experience in that field or calling as to make it appear that [the] opinion or inference will probably aid the trier [of fact] in his search for the truth." *Donati*, 215 Md. App. at 742 (citations omitted).

We find no abuse of discretion in the circuit court's conclusion that Detective Jendrek qualified as an expert through his experience, training, and education. The Detective described his extensive first-hand training and experience in analyzing cell phone call detail data, including: (1) training related to cell phones and call detail records from DEA and the Baltimore Police Department; (2) several courses, including a 40-hour course taught by the National Technical Investigators' Association; (3) lectures he had given regarding cell phone location techniques; and (4) 1,500 cases worth of direct experience. Although Detective Jendrek's undergraduate degree was in history and he had not published any articles involving cell phone location, "the qualifications he did have

supported the circuit court's decision to accept him as an expert witness," *Donati*, 215 Md. App. at 743, and amply so.

### C. The Circuit Court Did Not Abuse Its Discretion In Qualifying Detective Allen As An Expert Witness.

The State also called Baltimore City Police Detective Kevin Allen and sought to have him qualified as an expert witness in the field of digital forensics. Detective Allen testified that (1) he had 20 years of police experience; (2) had worked in the field of cell phone forensics specifically from 2009 to 2013; (3) had taken classes and received certifications "[w]ith the Department of Homeland Security and Mobile Device Investigations, CMD Labs, which is a certification for Cellebrite National White Collar Crimes Assocation, NW3C, BK Forensics for digital mobile seizure, Image Scan, which is with the FBI, and a host of other training;" (4) had been qualified as an expert witness in the field of digital forensics on a prior occasion; and (5) had analyzed over 1,000 cell phones. Over objection, the circuit court qualified Detective Allen as an expert in the field of digital forensics, and he testified that he had extracted data from Ms. Sipayboun's cell phone and, utilizing computer software, generated a report revealing the data stored on the cell phone. The report was later admitted into evidence by the State and used to adduce testimony from other witnesses about messages they had sent her.

Mr. Stevenson claims that the circuit court abused its discretion in qualifying Detective Allen as an expert because "Detective Allen had not received any degrees in the fields of telecommunications, network technology, electronics or radio frequency; his

13

training was limited to mobile devices; he had been qualified as an expert witness only once before the Circuit Court for Baltimore City." We disagree.

We recently affirmed a circuit court's decision to qualify a witness with similar credentials as an expert in the field of digital forensics in *Donati*, 215 Md. App. at 741-43. As here, the witness's experience in that case primarily took the form of on-the-job training and experience:

> Detective Heverly testified that he had completed more than 240 hours of training in computer forensics, as a result of which he had been "certified by the Department of Defense as a computer forensic examiner." He was a member of the "National White Collar Crime Center," the "International Association of Computer Investigative Specialists," the Department of Defense "Cyber Investigative Training Academy," and he was a deputized member of the "United States Secret Service, Washington Metro Electronic Crimes Task Force." In addition, he took a Windows Forensic Examinations course and a mobile forensic examination course for cell phones, GPS, and other mobile devices.

*Id.* at 742-43. We held that "[a]lthough [he] did not have post-graduate degrees in computer science, and he had not testified previously, the qualifications he did have supported the circuit court's decision to accept him as an expert witness." *Id.* at 743.

Detective Allen has taken classes and received multiple certifications in the field of digital forensics. *Id.* In addition, and unlike the witness in *Donati*, Detective Allen had been qualified as an expert witness in the field of digital forensics on a prior occasion, *id.* at 743, and had analyzed over 1,000 cell phones. His lack of degrees in the fields of

14

telecommunications did not disqualify him from serving as an expert, and the court acted within his discretion in qualifying him here.

### D. Mr. Stevenson Failed To Preserve His Contention That The Circuit Court Erroneously Admitted Inadmissible Hearsay.

At trial, Lashawn Stevenson, Mr. Stevenson's niece, was called to testify on behalf of the State. During the State's direct examination of Ms. Stevenson, the following exchange took place:

> [PROSECUTOR]: Okay. Do you recall telling the police that your father[, Mr. Stevenson's brother,] said [Ms. Sipayboun] just got cut up?
>
> [MS. STEVENSON]: I – I think so. I remember so. I think I said that. I don't know remember [sic]. I'm sorry.
>
> [THE COURT]: Next question.
>
> [PROSECUTOR]: Did your father say that [Ms. Sipayboun] had just been cut up?
>
> [DEFENSE COUNSEL]: Objection. She's harassing the witness.
>
> [THE COURT]: Approach, please.
>
> (Counsel and Defendant approached the bench, and the following occurred:)
>
> [THE COURT]: What's your objection?
>
> [DEFENSE COUNSEL]: I thought that she just asked a question and she wasn't sure that in terms of what she said. And again, she hasn't examined her on the – on the statement probably, and at times I don't even know what page she's on. What's –

15

[THE COURT]: Well, there are – there are two things happening is is [sic], you know, obviously, there's something in that statement you want to get to but it's sometimes better to go through some things before you jump 10 foot ahead. I'll allow the question as to whether or not you recall telling the police that your father said. Okay? And –

[PROSECUTOR]: Thank you.

[DEFENSE COUNSEL]: And I think she's already responded to that.

[THE COURT]: I'm going to allow the question so that we can move on.

[DEFENSE COUNSEL]: Okay.

[THE COURT]: I'm confused. Then at that point we're all in the same place. Let's move along, please.

(Counsel and Defendant returned to the trial tables, and the following occurred in open court:)

[THE COURT]: I understand the objection. In light of the prior response, the Court will allow the question.

[PROSECUTOR]: Do you recall telling the police that your father said that [Ms. Sipayboun has] been cut?

[DEFENSE COUNSEL]: Objection for reasons I already stated to you.

[THE COURT]: Objection is – is noted. Overruled. I'll allow you to answer that question. Do you recall saying that? That your father said –

[MS. STEVENSON]: Yes. Yes.

Mr. Stevenson argues that the circuit court erred in allowing Ms. Stevenson to testify that her father, Mr. Stevenson's brother, had told her that Ms. Sipayboun had been cut,

16

which he says is inadmissible hearsay. The State counters that Mr. Stevenson failed to preserve his objection for appellate review because Mr. Stevenson objected only on the grounds that the prosecutor was harassing the witness. We agree.

Objections to the admissibility of evidence are governed by Maryland Rule 4-323, which provides, in relevant part:

> (a) An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived. The grounds for the objection need not be stated unless the court, at the request of a party or on its own initiative, so directs. The court shall rule upon the objection promptly. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court may admit the evidence subject to the introduction of additional evidence sufficient to support a finding of the fulfillment of the condition. The objection is waived unless, at some time before final argument in a jury trial or before the entry of judgment in a court trial, the objecting party moves to strike the evidence on the ground that the condition was not fulfilled.

*Id.* "Unless a party properly raises an objection [to the admissibility of evidence] with the trial court, any error is deemed waived and ordinarily will not be considered on appeal." *Anderson v. Litzenberg*, 115 Md. App. 549, 568 (1997) (citations omitted); *see also* Md. Rule 8-131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court."). With respect to the preservation of an objection to the admissibility of evidence, we have said:

> Generally, Maryland litigants are not required to state the specific ground for an objection unless requested to do so by the trial court. Consequently, if a court overrules an objection, all grounds for the objection may be raised on appeal. On the

17

other hand, counsel may state with particularity the grounds for an objection, either voluntarily or at the trial judge's request. If counsel provides the trial judge with specific grounds for an objection, the litigant may raise on appeal only those grounds actually presented to the trial judge. *All other grounds for the objection, including those appearing for the first time in a party's appellate brief, are deemed waived.*

*Id.* at 569 (citations omitted) (emphasis added).

Here, as he acknowledges in his brief, Mr. Stevenson objected to the admissibility of Ms. Stevenson's testimony specifically on the grounds that the prosecutor was harassing Ms. Stevenson and that Ms. Stevenson had been asked the same question twice. Mr. Stevenson did not object to Ms. Stevenson's testimony as hearsay. That leaves any hearsay objection unasserted at trial and unpreserved for appeal. *See Banks v. State*, 84 Md. App. 582, 588 (1990) ("Although not required, when the grounds for an objection are stated by the objecting party, either on a volunteered basis or at the request of the court, only those specifically stated are preserved for appellate review; those not stated are deemed waived." (citations omitted)).

### E. The Circuit Court Did Not Err In Admitting Photographs of Mr. Stevenson's Hands.

After Mr. Stevenson was taken to police headquarters the day Ms. Sipayboun was killed, police took photographs of his hand and torso. On the first day of trial, Mr. Stevenson moved to suppress these photographs. Although it initially denied the motion, the circuit court ultimately prohibited the State from using photographs of Mr. Stevenson's torso, but permitted the State to use photographs of Mr. Stevenson's hands. Mr. Stevenson

18

contends that the circuit court erred in allowing the State to use even these because, he says, their probative value was substantially outweighed by the danger of unfair prejudice. The State counters that the photographs were probative to the issue of Mr. Stevenson's alleged criminal agency and therefore admissible. We agree with the State.

Maryland Rule 5-403 provides that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.* In *Ayala v. State*, 174 Md. App. 647 (2007), we set forth the general rule:

> [T]he general rule regarding admission of photographs is that their prejudicial effect must not substantially outweigh their probative value. This balancing of probative value against prejudicial effect is committed to the sound discretion of the trial judge. The trial court's decision will not be disturbed unless 'plainly arbitrary,' . . . because the trial judge is in the best position to make this assessment.
>
> Photographs must also be relevant to be admissible . . . The relevancy determination is also committed to the trial judge's discretion.

*Id.* at 679-80 (quoting *State v. Broberg*, 342 Md. 544, 552 (1996)). In addition, "photographs may be relevant and possess probative value even though they often illustrate something that has already been presented in testimony." *Lovelace v. State*, 214 Md. App. 512, 548-49 (2013) (quoting *Broberg*, 342 Md. at 553). "On review, we will not disturb a trial court's determination that the probative value of a photograph is not substantially outweighed by unfair prejudice 'unless plainly arbitrary.'" *Id.* at 549 (citation omitted).

19

These photographs, which were taken by police only hours after Ms. Sipayboun was killed, had substantial probative value, and Mr. Stevenson acknowledges as much. In his brief, he admits, correctly, that they "advanced the prosecution's theory that [Mr. Stevenson] had an injury to his hand, therefore [suggesting], he may have been involved in the fatal struggle with [Ms. Sipayboun]." They also corroborate testimony that the State adduced from Detective Ragland, who indicated that Mr. Stevenson's right hand was swollen when he encountered him hours after Ms. Sipayboun was killed. No other photographs showed Mr. Stevenson's hands during the relevant time frame. And aside from being helpful to the State's case, Mr. Stevenson does not explain in what way the photographs were *unfairly* prejudicial. *See id.* at 547, 550 (holding that circuit court did not abuse its discretion in admitting a photograph depicting a murder victim with a young female family member because it demonstrated that the victim was wearing a gold chain that was later recovered from the defendant and "[n]o other photograph showed [the victim's] face with the necklace").

F. **The Circuit Court Did Not Err In Admitting Testimony Establishing That Mr. Stevenson Initially Refused To Give A DNA Sample To Police.**

During the State's direct examination of Detective Ragland at trial, the following exchange took place:

> [PROSECUTOR]: Did you have a warrant for [Mr. Stevenson's] DNA?
>
> [DETECTIVE RAGLAND]: Yes, I did.

20

[PROSECUTOR]: And what, if anything, happened during the attempt to recover his DNA?

[DEFENSE COUNSEL]: Objection.

[PROSECUTOR]: During the –

[THE COURT]: Sustained. Sustained. You want to approach?

[PROSECUTOR]: Yes.

[THE COURT]: Then you have to ask.

(Counsel and Defendant approached the bench, and the following occurred:)

*        *        *

[PROSECUTOR]: Your Honor, it is the State's position that the Defendant's hesitancy to – about giving his DNA sample, goes to consciousness of guilt and therefore I believe that it is pertinent and relevant in this case.

*        *        *

[THE COURT]: I'm going to overrule. If it is what I just heard, I'll allow it – what I've just heard. But I – let's move along.

(Counsel and Defendant returned to the trial tables, and the following occurred in open court:)

[THE COURT]: Be mindful of the question and I'm going to overrule. I'll allow the question based on the proffered statement of the State. Ladies.

[PROSECUTOR]: What, if anything, occurred during the recovery of the sample of Mr. Stevenson's DNA?

[DEFENSE COUNSEL]: Objection for the record.

21

[THE COURT]: Objection noted.  Overruled.  You may answer.  Briefly.

[DETECTIVE RAGLAND]: He refused.

[PROSECUTOR]: Did he eventually give his DNA?

[DETECTIVE RAGLAND]: Yes.

[PROSECUTOR]: And what, if anything, transpired between his initial refusal and his giving DNA?

[DETECTIVE RAGLAND]: I had to get a supervisor to reiterate that this was a Court order for him to give the DNA.

Mr. Stevenson contends that the circuit court erred in allowing Detective Ragland to give this testimony.  In response, the State argues that the circuit court properly admitted the testimony as evidence of Mr. Stevenson's consciousness of guilt.  Again, we agree with the State.

A person's behavior after a crime can qualify as circumstantial evidence, or lead to reasonable inferences, that he is conscious of his guilt:

> A person's behavior after the commission of a crime may be admissible as circumstantial evidence from which guilt may be inferred.  This category of circumstantial evidence is referred to as 'consciousness of guilt.'  We observed in *Snyder v. State*, 361 Md. 580, 591 (2000), that "[i]f relevant, circumstantial evidence regarding a defendant's conduct may be admissible under Md. Rule 5-403, not as conclusive evidence of guilt, but as a circumstance tending to show a consciousness of guilt."  Conduct typically argued to show consciousness of guilt includes flight after a crime, escape from confinement, use of a false name, and destruction or concealment of evidence.
>
> A person's post-crime behavior often is considered relevant to the question of guilt because the particular behavior provides

22

clues to the person's state of mind. The reason why a person's post-crime state of mind may be relevant is because, as Professor Wigmore suggested, the commission of a crime can be expected to leave some mental traces on the criminal.

*Thomas v. State*, 397 Md. 557, 575-76 (2007) (citations omitted). A defendant's resistance to submit to a police-administered blood test as evidence of consciousness of guilt can fall into this category:

> The relevance of the evidence as circumstantial evidence of . . . guilt depends on whether the following four inferences can be drawn: (1) from [the] resistance to the blood test, a desire to conceal evidence; (2) from a desire to conceal evidence, a consciousness of guilt; (3) from a consciousness of guilt, a consciousness of guilt of the murder . . . ; and (4) from a consciousness of guilt of the murder[,] . . . actual guilt of the murder.
>
> \*     \*     \*
>
> To be relevant, it is not necessary that evidence of this nature conclusively establish guilt. The proper inquiry is whether the evidence could support an inference that the defendant's conduct demonstrates a consciousness of guilt. If so, the evidence is relevant and generally admissible.

*Id.* at 576-77 (citations omitted).

Detective Ragland testified that when he initially attempted to recover Mr. Stevenson's DNA pursuant to a search warrant and as part of the police's investigation into Ms. Sipayboun's murder, Mr. Stevenson refused. He further testified that Mr. Stevenson only agreed to provide his DNA after his supervisor informed Mr. Stevenson that his compliance was required by a court order. Mr. Stevenson claims that the circuit court erred in admitting Detective Ragland's testimony because "[o]nce he was fully informed about

the legal authority of the police to obtain the [DNA] sample, [he] cooperated." In his view, "his initial hesitancy or resistance cannot be connected to consciousness of guilt concerning the crime charged" because there was another explanation for his behavior: that he was merely "asking about his constitutional rights to counsel and whether or not he could see the warrant and whether or not he had to produce same."

The Court of Appeals has rejected the distinction Mr. Stevenson tries to make here. In *Thomas*, 397 Md. 557, the defendant argued that the circuit court erred in admitting testimony indicating that he resisted a police-administered blood test during a murder investigation because "numerous other factors could have explained his reluctance to submit to the testing." *Id.* at 577. The Court of Appeals found this argument unconvincing, and said that it is up to the defendant to offer an alternative explanation for his resistance, not the State's burden to prove that there isn't one:

> Simply because there is a possibility that there exists some innocent, or alternate, explanation for the conduct does not mean that the proffered evidence is *per se* inadmissible. If it was the position of petitioner that he feared needles, or that the drawing of blood violated some religious belief he held, or any other innocent explanation for his conduct, it was incumbent upon him to generate that issue. He had the opportunity at trial to offer alternative theories explaining his resistance to the blood test, and the record is completely devoid of any such evidence. The State is not required to anticipate any or all conceivable innocent explanations for a party's refusal to submit to a blood test, and its failure to do so is not a basis to exclude the evidence.

*Id.* at 578 (citations omitted).

Similarly, to the extent Mr. Stevenson is suggesting that his initial refusal to provide a DNA sample to police during Ms. Sipayboun's murder investigation was due to his concern for his constitutional rights, "it was incumbent upon him to generate that issue" at trial. *Id.* Like the defendant in *Thomas*, Mr. Stevenson "had the opportunity at trial to offer alternative theories explaining his resistance to [submitting a DNA sample], and the record is completely devoid of any such evidence." *Id.* Moreover, Mr. Stevenson does not dispute that he knew that Detective Ragland wanted to take a DNA sample as part of his investigation. We see no abuse of the circuit court's discretion in its decision to admit this testimony.

## G. The Circuit Court Did Not Err In Admitting Evidence Indicating That Mr. Stevenson Was Physically Abusive To Ms. Sipayboun Less Than A Month Before She Was Killed.

Mr. Stevenson claims next that the circuit court erred in admitting evidence of "other crimes, wrongs, or acts" in violation of Maryland Rule 5-404(b), specifically Sister's testimony that he physically abused Ms. Sipayboun less than a month before she was killed. Before trial, Mr. Stevenson argued that this testimony would be inadmissible because he "had not been convicted of any offenses and [Ms. Sipayboun] had not reported any incidents of violence to law enforcement officers." The State countered that it had a strong factual basis for the evidence it sought to admit, noting that Sister "actually lived with Mr. Shawn Stevenson and [Ms. Sipayboun] and she was able to observe several of the fights between [Mr.] Stevenson and [Ms. Sipayboun]." The circuit court denied the motion:

25

> Well, the motion is denied based on the facts and circumstances of the assertions, the dates and times, the type of abuse that's being suggested and the relevant time area in close proximity to the crime in question. Therefore, the Court does find it to be relevant information subject to cross-examination as to credibility and the extent thereof and the motion is denied.

During the trial, the State elicited testimony from Sister that (1) she witnessed arguments between Mr. Stevenson and Ms. Sipayboun less than a week before Ms. Sipayboun was killed; (2) Ms. Sipayboun had told her that Mr. Stevenson had tried to force her to have sex with him against her will; and (3) two weeks before she was killed, Ms. Sipayboun had a slap mark on her face and a knot on her chin. This testimony was corroborated by Mr. Potter, who testified that he saw a bruise on Ms. Sipayboun's face two weeks before she was killed and that she had told him that Mr. Stevenson had punched her in the face and was abusive.

Mr. Stevenson contends that the circuit court admitted this testimony in violation of Md. Rule 5-404(b). The Rule directs courts to look at whether there is special relevance to the testimony and then, if so, to balance that enhanced probativity against the possibility of unfair prejudice:

> Maryland Rule 5-404(b) limits evidence of a defendant's prior "bad act[s]," and specifically precludes bad acts evidence offered for the purpose of proving that the defendant's character "in order to show action in conformity therewith." Md. Rule 5-404(b); *Klauenberg v. State*, 355 Md. 528, 546 (1999). A "bad act" is an act or conduct "that tends to impugn or reflect adversely upon one's character, taking into consideration the facts of the underlying lawsuit." *Klauenberg*, 355 Md. at 549. This rule plays a role similar to

26

the prohibition against unfairly prejudicial evidence, *i.e.*, to prevent the jury from "'developing a predisposition of guilt'" based on unrelated conduct of the defendant. *Sinclair v. State*, 214 Md. App. 309, 334 (2013) (quoting *State v. Faulkner*, 314 Md. 630, 633 (1989)).

Although "bad act" evidence is inadmissible to prove a defendant's criminal character, Rule 5-404(b) does allow "bad act" evidence that has "special relevance—that it 'is substantially relevant to some contested issue.'" *Wynn v. State*, 351 Md. 307, 316 (1998) (quoting *State v. Taylor*, 347 Md. 363, 368 (1997)). "Bad act" evidence has a "special relevance if it shows notice, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident." *Id.*; Md. Rule 5-404(b). Whether "bad act" evidence demonstrates one of these alternate purposes is a "'legal determination and does not involve any exercise of discretion'" by the trial court; we review this determination *de novo*. *Wynn*, 351 Md. at 317 (quoting *Faulkner*, 314 Md. at 634).

This leads to a two-step analysis. If we determine that the "bad act" evidence in question has special relevance, then we balance the probative value of and need for the evidence against the likelihood of undue prejudice. "'This segment of the analysis implicates the exercise of the trial court's discretion,'" and we will only reverse the court's balancing determination if the court abused its discretion. *Id.* (quoting *Faulkner*, 314 Md. at 634-35).

*Smith v. State*, 218 Md. App. 689, 709-10 (2014) (footnote omitted).[2]

---

[2] Actually, there is an intervening step: after determining that a piece of "bad act" evidence has special relevance, the court must decide whether the State proved the defendant's involvement in the "bad act" by "'clear and convincing evidence.'" *Wynn*, 351 Md. at 317 (quoting *Faulkner*, 314 Md. at 634-35). But in this case, Mr. Stevenson does not challenge that the State proved he physically abused Ms. Sipayboun in the weeks before she was killed by "clear and convincing evidence." *Id.* In any event, the testimony offered by Sister and Mr. Potter was sufficient to support a finding that Mr. Stevenson acted in the manner they described.

The State argues that the "bad act" evidence at issue here has special relevance because it "was probative of [Mr. Stevenson's] motive to murder." We agree. Both Sister and Mr. Potter witnessed recent acts or recent evidence of violent and physically abusive acts by Mr. Stevenson against Ms. Sipayboun. In *Snyder v. State*, 361 Md. 580 (2000), the Court of Appeals noted that "[e]vidence of previous quarrels and difficulties between a victim and a defendant is generally admissible to show motive." *Id.* at 605 (citation omitted). The circumstances in that case parallel this one closely:

> In the case *sub judice*, as we have seen, the evidence consisted of the July 30, 1985 physical dispute between [Mr. Snyder] and the victim, testimony that [Mr. Snyder] and the victim had a "stormy" relationship, and testimony from a friend of the victim concerning a fight the night before the murder in which the petitioner allegedly stated that the victim was "a dead woman." Thus, the jury heard testimony indicating that there was disharmony in the household. That evidence was probative of a continuing hostility and animosity, on the part of [Mr. Snyder], toward the victim and, therefore, of a motive to murder, not simply the propensity to commit murder.

*Id.* at 608-09. As in *Snyder*, the testimony here "was probative of a continuing hostility and animosity, on the part of [Mr. Stevenson], toward [Ms. Sipayboun] and, therefore, of a motive to murder." *Id.*; *see also Jones v. State*, 182 Md. 653, 657 (1944) (holding that circuit court properly admitted evidence of certain violent acts defendant directed toward his wife during their marriage as evidence of the defendant's motive to murder his wife). The circuit court did not err in admitting this testimony.

28

**H.** **There Was Sufficient Evidence To Support Mr. Stevenson's Convictions For First-Degree Murder And First-Degree Sexual Offense.**

*Finally*, Mr. Stevenson contends that the evidence was insufficient to support his convictions. He grounds this challenge solely on the claim that there was not sufficient evidence to show that *he* was responsible for the murder and sexual assault of Ms. Sipayboun because "the prosecution presented a purely circumstantial case." He notes that there were no eyewitnesses to the murder, no witness putting him at the scene of the crime, and no forensic evidence connecting him to the crime. The State responds that "there was strong evidence of motive" given Mr. Stevenson's "recent violent acts toward [Ms. Sipayboun]" and testimony indicating that "[Ms. Sipayboun] was not only having an affair, but she was leaving [Mr. Stevenson] and she was taking his children." Moreover, the State argues, "the cell phone evidence provided strong circumstantial evidence of criminal agency." We find that there was sufficient evidence to support the convictions.

Evidence is sufficient to support a conviction if, "'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Coleman*, 423 Md. 666, 672 (2011) (quoting *Facon v. State*, 375 Md. 435, 454 (2003)). Our concern is not with whether the verdict tracks the weight of the evidence, "but rather is only with whether the verdicts were supported with sufficient evidence–that is, evidence that either showed directly, or circumstantially, or supported a rational inference of facts which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable

29

doubt." *State v. Albrecht*, 336 Md. 475, 479 (1994). "We 'must give deference to all reasonable inferences [that] the fact-finder draws, regardless of whether [the appellate court] would have chosen a different reasonable inference.'" *Cox v. State*, 421 Md. 630, 657 (2011) (quoting *Bible v. State*, 411 Md. 138, 156 (2009)). Further, we do not "'distinguish between circumstantial and direct evidence because [a] conviction may be sustained on the basis of a single strand of direct evidence or successive links of circumstantial evidence.'" *Montgomery v. State*, 206 Md. App. 357, 385 (quoting *Morris v. State*, 192 Md. App. 1, 31 (2010)), *cert. denied*, 429 Md. 83 (2012).

There was, as the State contends, strong circumstantial evidence establishing Mr. Stevenson's motive to murder Ms. Sipayboun. The State presented evidence that Mr. Stevenson was the beneficiary of a significant life insurance policy insuring her life, and at the time she was killed, Ms. Sipayboun was in the process of moving out of their home over tension in their relationship, which had been caused by her intimate relationship with Mr. Potter. The trial included evidence that on the day Ms. Sipayboun was killed, Mr. Stevenson called her and demanded she move her belongings out of the house to which she had moved. And as we discussed above, Sister and Mr. Potter offered testimony demonstrating that Mr. Stevenson had physically abused Ms. Sipayboun in the weeks immediately preceding Ms. Sipayboun's death.

Strong circumstantial evidence also connected Mr. Stevenson to the crimes. Detective Ragland testified that there was no damage to the doors of Ms. Sipayboun's house, which suggested that she was killed by someone familiar. Detective Jendrek's

30

testimony established that Mr. Stevenson was in close proximity to the scene of the crime when Ms. Sipayboun was killed, which contradicted Mr. Stevenson's claim that he was in the area of Golden Ring Mall at the time. Detective Jendrek also connected Mr. Stevenson's cell phone to North Point Road in Dundalk, where Ms. Sipayboun's abandoned cell phone was found later on. And Mr. Stevenson's contemporaneous (and otherwise unexplained) hand injury also suggested that he could have been involved in Ms. Sipayboun's violent death. There was more than enough here for a jury reasonably to conclude that Mr. Stevenson killed and sexually assaulted Ms. Sipayboun.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**